**In re Harry TESMETGES, a/k/a Theoharis Tesmetges, a/k/a Harry Thomas, a/k/a Henry Best, Debtor.**

**Robert J. MUSSO, Trustee, Plaintiff,**

**v.**

**Bernard HERMAN, Lelia Herman, Harry Tesmetges and Theresa Tesmetges, Defendants.**

**Bankruptcy No. 180–07354–260. Adv. No. 181–0473.**

United States Bankruptcy Court, E.D. New York.

April 22, 1988.

Robert J. Musso, Brooklyn, N.Y., Trustee, pro se.

Philip M. Kovitz, New York City, former Atty. for Trustee.

Sager & Gellerman, Forest Hills, N.Y., by Audrey Sager, for Bernard and Lelia Herman.

Barry M. Lasky, Garden City, N.Y., for Harry Tesmetges, debtor.

Theresa Tesmetges, pro se.

## DECISION

CONRAD B. DUBERSTEIN, Chief Judge.

Seven years after this adversary proceeding was commenced by the trustee to establish a fraudulent conveyance and impress an equitable lien, we finally come to the end of the long journey. As is the case where fraudulent intent requires proof of circumstantial evidence, it took the trustee that much time to try to put together the myriad tiles necessary to make up the mosaic. Equally important was the need to probe into the truthfulness of the testimony of the defendants, a factor which also contributed to the unusual length of time consumed by the trustee in attacking their credibility. Sixty hearings were held in which my predecessor, Honorable Manuel J. Price, presided over 10 and I over 50 after he retired in July of 1984. More than 5,500 pages of trial testimony were reviewed as were approximately 300 pages of transcripts of examinations under the Bankruptcy Rules, and about 700 pages of testimony in related issues both in this court and in state court actions initiated prior to this bankruptcy case involving the same defendants and in which the attorney for the plaintiff was the same as the attorney for the trustee in this case, for an overall total of about 6,500 pages of testimony. Eighty exhibits were examined including documents accepted during the tri-al subject to the ultimate determination as to their relevancy and admissibility.

For the reasons hereinafter set forth, this court concludes that there was no fraudulent conveyance, the trustee is not entitled to impress an equitable lien against property involved in this conveyance, and the complaint is dismissed as to all defendants.

### I

In this adversary proceeding the trustee seeks to have the court adjudge that the transfer of a contract executed by the debtor's wife for the purchase of a dwelling house on Sawyer Avenue in Hollis, New York in which they had lived as tenants, was a fraudulent conveyance. It further seeks to have held that although the transfer was made to her sister and brother-in-law which enabled them to acquire property in their names, it should be deemed an asset of the estate. Finally, it seeks to have the property impressed with an equitable lien in favor of the trustee. The relief which the trustee seeks is governed by Bankruptcy Code § 544 which enables a trustee to have deemed voidable a transfer under state law, in this instance, Article 10 of the Debtor and Creditor Law of the State of New York. The complaint also looks to Bankruptcy Code § 550 which proscribes the liability of a transferee under an avoided transfer, and §§ 541 and 542 which deal with the property of the estate and its turnover to the trustee.

### A REVIEW OF THE FACTS RELATING TO THE SAWYER AVENUE PROPERTY

As far back as July of 1974, the debtor, Harry Tesmetges and his wife Theresa, also known as Terry, both of whom are defendants in this action, were tenants of the Sawyer Avenue residence under a lease which was to expire on July 31, 1976. The landlords were Lachman and Lalita Das. Their attorney was David Brown, Esq. The lease provided for rent of $500 per month together with security of $1,000. It contained an option to purchase the property for $50,500. The option provided that

every $100 of the monthly rent would be applied as a credit towards the purchase price in addition to the $1,000 security in the event the tenants exercised the option. If the tenants failed to exercise the option, the rent would continue at $500 a month without any deductions, and the $1,000 security would be returned to them at the expiration of the lease if all of its terms had otherwise been observed. The lease was not assignable without the consent of the landlords.

July 31, 1976, the date of the expiration of the lease, came and went and the option was not exercised. Thus, it too expired. *Lazarus v. Flournoy*, 28 A.D.2d 685, 280 N.Y.S.2d 745. (2d Dept.1967). However, both the debtor and Theresa remained in possession as hold-over tenants on a month-to-month basis pursuant to New York Real Prop.Law § 232–c (McKinney 1968).

Documents in evidence presented to the court for its consideration during the trial reveal that shortly after the lease expired, the Tesmetges expressed an interest in buying the house because of the possibility of getting the Dases to sell it to them under the same favorable terms as contained in the option. Their testimony underscored the fear that if they were unable to acquire the house, not only they, but Theresa's family—her brother, her cousin, and from time to time, her parents who were residing there, would be left without a place to live.

The first of the documents appears in the form of an unsigned Rider which refers to a contract of sale dated October 1976, without specific date. The Rider describes Harry Tesmetges and Theresa Tesmetges as the purchasers. The contract itself was not produced during the course of the trial.

The first evidence of a proposed written contract appears in December of 1976. Unsigned and undated, except for reference to the month and year, it runs between the landlords and Theresa Tesmetges as purchaser. Testimony of both Theresa and Harry indicates that they were convinced that because of his unsatisfactory credit standing and his inadequate income of less than $8,000 he would not qualify for a mortgage necessary to purchase the house. The record indicates that it was conceded by the attorney for the trustee during the trial that because of the many judgments against the debtor and Theresa, as well as their weak financial status, neither would have been able to obtain a mortgage. The purchase price was fixed at $50,500, the same as in the option. It provided for applying the $100 monthly credits towards the purchase price also as contained in the option. It required Theresa to obtain a mortgage commitment within a fixed time. Besides recognizing Theresa Tesmetges as the purchaser, it stated that she was in possession of the premises. It also called upon Harry to execute all documents in connection with the mortgage which Theresa was required to obtain. Although the contract was not signed by Theresa or the landlords, both of the Tesmetges remained on the premises and the landlords continued to accept their monthly rent.

Toward the middle of 1977, Theresa commenced taking steps necessary to a mortgage commitment, even though the testimony indicates that she was far from certain that one would be available in light of her own poor financial condition. She applied through a mortgage lender, Kadilac Funding Corp. ("Kadilac"), for a Certificate of Reasonable Value from the Veterans Administration. Her testimony as well as that of the debtor indicates that even though she was not a veteran and had no intention of obtaining a mortgage with the Veterans Administration guaranty, it was common practice for an application to be made to the Veterans Administration even by a non-veteran to obtain the Certificate which a mortgagee would look to in determining the value of the property on which the mortgage commitment was being sought. She also applied to Dale Funding Corp. ("Dale Funding"), another lender, for a mortgage commitment.

The testimony of Theresa's sister Lelia Herman, who is also a defendant, indicates that because Lelia believed that neither Theresa nor Harry would be able to obtain a mortgage, she, Lelia also became increasingly concerned about what would happen

to her mother, her father, her brother, her cousin Alicia, and Theresa, as well as Harry, if the house were sold to someone else. As a result, Lelia and her husband Bernard, the last of the defendants, also began to take steps to purchase the house. Although they had testified that they had looked at other houses with the intention of purchasing one as their residence in place of the apartment they occupied in Forest Hills, New York, they further testified that the opportunity to buy the Sawyer Avenue house at fair market value with the advantage of applying the monthly rent credits against the purchase price made it more financially attractive while at the same time it would enable everyone to live there. Because of their familiarity with the real estate business, Theresa and Harry undertook to help them obtain a mortgage commitment. They assisted Bernard in preparing a mortgage application form which was submitted to Kadilac. Inasmuch as Bernard was a veteran, they also helped him in applying to the Veterans Administration early in March of 1978 for a guaranty of a mortgage in the sum of $49,500. Kadilac thereupon commenced processing the mortgage application by communicating with Bernard's employer for verification of his employment, his banks for verification of his bank balances, and with various department stores for credit information regarding his accounts. Eventually Kadilac committed itself to him for a mortgage loan for $49,500 payable over 30 years at 9% interest.

Notwithstanding all of the foregoing steps taken by the Hermans to buy the house, and prior to Kadilac's commitment to a mortgage, the testimony reveals that Theresa still continued in her efforts to enter into a contract with the Dases so as to tie them up to the sale of the house under the same favorable terms as were contained in the option which had since expired. With that purpose in mind, she arranged with the Das's attorney Brown to prepare a new contract of sale. It is dated December 29, 1977 and is the first contract for the purchase of the house which was actually signed. Theresa was named in the contract again as the purchaser and she executed it as the purchaser. It stated that the premises were occupied by her. The provision which appeared originally in the unsigned December 1976 proposed contract which called for the debtor to join with her in executing necessary mortgage documents was not included in the new contract. The selling price remained at $50,500 and the credits originally made available by the option were the same. It further provided that one of the realty companies of which the debtor was a principal, Qualified Realty Corp., brought about the sale. Closing was set for February 28, 1978. Shortly before that date, Dale Funding, to whom Theresa had applied for a mortgage, communicated with her. It agreed to commit itself to a mortgage conditioned on the approval of her credit. The commitment did not come through. The closing was not held.

By the following month, March of 1978, the Tesmetges were seven months in arrears in their rent, totalling $3,500. Brown instituted an action on behalf of the Dases in the Civil Court of the State of New York to dispossess the Tesmetges from the premises. At a hearing held on March 15, 1978 before a judge of that court, a stipulation of settlement was entered on the record between Brown as the attorney for the landlords and a Ronald Singer, Esq. of the law firm of Wolff & Hass, the attorneys for Harry and Theresa Tesmetges as tenants. Because the terms of the stipulation are significant to this decision, it is quoted in full as follows:

STIPULATION OF SETTLEMENT

HARRY TESMETGES, respondent, was duly sworn

MR. SINGER: Mr. Tesmetges, are you the husband of Terry?

MR. TESMETGES: Yes, I am.

MR. SINGER: And you have the authority to act on her behalf in this proceeding?

MR. TESMETGES: Yes, I do.

MR. BROWN: The attorneys for the respective parties and Harry Tesmetges,

the tenant, have entered into the following stipulation of settlement:

1) Tenants acknowledge they are indebtedness (sic) to the landlord through and including the month of March, 1978, to the sum of thirty-five hundred dollars ($3500), which the tenants agree to pay as follows:

Two thousand dollars ($2,000) on or before March 31, 1978 and fifteen hundred dollars ($1500) on or before April 15th.

2) Upon payment in accordance with the terms of this stipulation, the within proceeding shall be deemed discontinued.

3) Upon a default in payment, the landlord shall have the right to apply to the Court ex parte for a final order with a fifteen (15) day stay of execution.

4) Pursuant to the lease entered into between the parties, the tenants had an option to purchase the premises 218–60 Souer (sic) Avenue, Queens Village, New York, which option was exercised and a contract entered into between the parties.

5) The purchasers, the tenants, herein are presently in default under the terms of said contract but the sellers are willing to reinstate the same.

6) Landlord and tenants and/or their assignee, shall enter into a new contract for the purchase of premises 218–60 Souer (sic) Avenue, Queens Village New York for the same price as heretofore set forth in the contract between the parties. (sic) In which the assignee shall have the right to make application for a G.I. mortgage or failing in this respect, landlord agrees to enter into a contract with the tenants who shall have the right to make application for a P.M.I. Conventional or F.H.A. mortgage.

7) Parties agree that the tenants waive their right to a refund of one hundred dollars ($100) per month recited in the lease between them, in the event this transaction shall not close because of default of purchasers, the tenants herein or their assignees.

8) The only repairs that the landlord shall be obligated to make, pursuant to the terms of the contract, shall be to replace any and all shingles on the roof of the house and garage. Said repairs to the roof shall be satisfactory to the Veterans Administration and/or F.H.A.

9) The contracts to be signed by the tenants and/or their assignee shall be within three (3) weeks from the time the contracts are forwarded to Wolff and Hass, attorneys for the tenants. If the contracts are not signed within said time, it shall be deemed that the tenants have forsaken their option to purchase the premises.

THE COURT: Mr. Brown, from the beginning I remember that you started to talk about tenant acknowledging certain amounts of money being due. I assume by that you mean you are amending the petition to include all rents due through March 31, 1978?

MR. BROWN: That is correct.

MR. SINGER: I have no objection to that your Honor.

THE COURT: Anything else?

MR. BROWN: No. your Honor.

THE COURT: Everything in the record?

MR. BROWN: Yes.

MR. SINGER: Yes.

THE COURT: All right, case settled pursuant to stipulation dictated into the record.

During this trial Lelia Herman testified that after the above hearing she paid the first $2,000 rent arrear installment pursuant to the stipulation. Her further testimony indicates that she and Bernard paid the remaining $1,500 under the stipulation. No actual proof of both payments was tendered during the trial. Brown then prepared a new contract of sale between the Dases as sellers and Theresa Tesmetges as purchaser, even though the March 15, 1978 stipulation allowed for a contract to be entered into with an assignee. The contract stated that the parties enjoyed the relationship of landlord and tenant. It was executed on April 5, 1978. It again provided for the selling price of $50,500 and recognized the right to apply the rent credits as originally called for under the option. It further provided that the credits would con-

tinue until the date of closing which was set for June 29, 1978; in the event of a failure to close the only sum which would be paid to the intended purchaser would be the refund of the security deposit as provided for in the original lease and that "the tenant and/or her husband" would waive the right to make any claim to any of the $100 rent credits. There was no provision in the contract for a broker. It was also conditioned on the purchaser obtaining a commitment for a first mortgage loan, VA approved, and/or an FHA loan in the sum of $45,000 for 25/30 years. The contract stated that the premises were occupied by the purchaser.

An assignment of the contract from Theresa Tesmetges to Bernard and Lelia Herman was executed on April 5, 1978. It reads as follows:

### ASSIGNMENT

For value received the within contract and all the right, title and interest of the purchasers thereunder are hereby assigned, transferred, and set over unto BERNARD HERMAN and LELIA HERMAN, his Wife, and said assignees hereby assume all obligations of the purchasers thereunder.

> S/ Terry Tesmetges
> Purchaser
> S/ Bernard Herman
> Assignee
> S/ Lelia Herman
> Assignee

Dated: April 5, 1978

Apart from all of the foregoing, the evidence shows that a copy of the December 1976 contract which had never been previously signed but which ran from the Dases to Theresa Tesmetges was modified in part by substituting the Hermans as the purchasers in place of Theresa. Where it made no reference to a date, the 22nd day of December was inserted and the year was changed from 1976 to 1977. A further provision was added to the copy to the effect that Qualified Realty, Inc. brought about the sale and would get paid 6% commission of the sale's price by the purchaser. The last sheet of the copy was further modified by adding two places for the signatures of each of the Dases and two places for each of the Hermans. All of the foregoing was done by Brown in anticipation of the forthcoming closing. He also prepared the deed to the premises from the Dases to the Hermans and then sent it and the modified contract to the Dases in Houston, Texas where they resided at that time. After they had executed the documents they returned them to Brown who had the modified contract signed by the Hermans at the closing. The Veterans Administration issued its Certificate of Commitment for the $49,500 mortgage to Bernard Herman on April 7, 1978.

The closing of title was held at the office of Kadilac on June 22, 1978. Present were Brown on behalf of the landlords, the Hermans, the Tesmetges, and representatives of the mortgagee and the title company. The purchase price of $50,500 was paid by the Hermans out of the proceeds of the $49,500 mortgage and the rent credits of about $4,800.

The Hermans were charged with the usual purchaser's closing costs consisting of real estate tax adjustment, fees to the attorney for Dases' existing mortgagee, title company costs and expenses, insurance, mortgage funder's fee including a mortgage discount charge otherwise known as "points" and a fee to the attorney for the sellers, all amounting to over $5,000. In addition, there was paid by the Hermans for the Tesmetges out of the mortgage loan of $49,500, three months rent due from the Tesmetges to the Dases totalling $1,500, and $375 incurred by the Tesmetges which the title company required to be paid, for a total of $1,875.

### PROCEDURAL STEPS TAKEN BY THE TRUSTEE IN THIS ACTION

The trustee, represented by Philip M. Kovitz, Esq. as his attorney in this bankruptcy case, commenced this action on August 31, 1981. In addition to the foregoing defendants, he also named Kadilac and its successor New York Guardian Mortgagee Corp., the Veterans Administration, and the Register of the City of New York.

After issue had been joined, a motion brought by Kadilac and the New York Guardian Mortgagee Corp. for summary judgment dismissing the complaint as to them was granted and the action against the Veterans Administration and the Register of the City of New York was withdrawn. The Tesmetges and the Hermans as remaining defendants and the trustee made numerous motions directed to the pleadings, including motions for summary judgment which were heard by my predecessor, Honorable Manuel J. Price. He denied the motions for summary judgement on May 22, 1984.

The trial continued before me during which time I granted the trustee's motion to amend the complaint on December 28, 1984. The amendment included a cause of action for an equitable lien on the property for $49,790 which the trustee contended represented the amount advanced by the Tesmetges or by either of them to effect the sale to the Hermans, together with the payments made under the mortgage.

On August 19, 1985 this court granted the trustee leave to file a further amended complaint to clarify and more definitely state fraudulent conveyance causes of action under Article 10 of the Debtor and Creditor Law of the State of New York. This is the complaint presently before the court. Specifically, it seeks judgment that the contract of sale between Theresa Tesmetges and the landlords as well as her assignment of the contract to the Hermans were both executed by her on behalf of herself and the debtor and that by reason thereof the contract and assignment constituted a fraudulent conveyance as to the creditors of the debtor. It further seeks to have the Sawyer Avenue property turned over to the trustee as an asset of the debtor to the extent of his interest, the same to be disposed of by the trustee in accordance with the Bankruptcy Code. The equitable lien sought was further elaborated on to include the amount the Hermans received from the proceeds of the mortgage which they paid out at the closing, the monthly mortgage payments made after the closing, as well as the balance remaining under the mortgage, all aggregating the sum of $49,790.

Upon completion of the trial the court granted the trustee's motion, joined in by the defendants, to conform the pleadings to the proof. The court now renders this decision as to the issues involved.

## THE DEFENDANTS AND THEIR FAMILY MEMBERS OF THE SAWYER AVENUE HOUSE AND THEIR CONTRIBUTIONS FOR SUCH RESIDENCY

The testimony indicates that prior to and after the closing, in addition to the Tesmetges residing in the house, Theresa's brother Rolando and her cousin Alicia Salgado also lived there. Theresa's father, Dr. Fabio Gastelu also lived in the house with his wife until she died in 1982, except for his visits to Peru usually in the winter season. Harry left the house in November of 1982 when he separated from Theresa. He has not lived there since.

Testimony elicited by the trustee and the defendants indicates that the Tesmetges, Rolando and Alicia made contributions in consideration of their residing in the house. For a period after the closing the Tesmetges contributed approximately $150 a month which was eventually increased to between $300 and $350 a month until Harry's departure. Theresa's contribution after Harry left amounted to approximately $125 a month which was eventually increased to about $200 a month. Rolando paid $250 a month until the early part of 1986 when he increased it to about $300 a month. Alicia's contributions varied between $30 to $70 a month. She also paid for all of the utilities including the electricity, heat and telephone and bought food for the family from time to time. All contributions were made in cash and were collected by Alicia who then turned the monies over to Lelia. Lelia testified that she would then deposit the funds in her account which were applied towards the monthly mortgage payments of $538. When insufficient contributions were made from the family members she made up the difference. On several occasions she did not deposit the funds but

used the monies for other purposes but in any event, that did not affect the mortgage payments which she made each month. She also testified that she too bought food for the household on many occasions because she, her husband Bernard and her son would often spend weekends in the house. The trustee produced copies of seven checks drawn by Alicia Salgado on her bank account, each in the sum of $538 payable to Bernard Herman, for the months of January through and including July of 1979. At first Alicia testified that she believed that the checks represented repayments of loans made to her by her cousin Lelia; eventually her testimony as well as that of Bernard Herman's indicated that the checks represented the amount of the monthly mortgage payments due for those months and that the funds were derived from the contributions from the family members, including herself, as set forth above. The trustee also produced a check for $538 drawn in 1979 to Bernard Herman on the account of Theresa's father, Dr. Fabio Gastelu, and signed by Theresa under power of attorney.

Theresa lived, and still lives in the basement of the house; her father and brother shared, and still share a room on the main floor; and Alicia lived, and still lives in another room on that floor. A spare room has been used by the Hermans when they spend their weekends in the house. They never have resided there. About two years after the closing, their apartment went co-op and they bought it and have lived there since.

The debtor and Theresa testified that at no time did they make any of the monthly mortgage payments directly or indirectly. Alicia's testimony confirmed that. The testimony of Bernard and Lelia Herman also indicated that they never received any monies from the debtor or Theresa for the monthly mortgage payments although shortly after the closing, the debtor received from the Hermans several of the monthly mortgage payments which the debtor delivered and paid over to the mortgagee.

## THE VALUE OF THE SAWYER AVENUE PROPERTY

Early in the course of the trial and on July 17, 1984, the Honorable Cecelia H. Goetz, a bankruptcy judge of this court acting for Honorable Manuel J. Price, signed an order appointing Jacques Tuchler to appraise the Sawyer Avenue property as of July of 1974 when the lease was signed, June of 1978 when the closing took place, and also as of the date of the appraisal. The appraisal was filed on September 26, 1984. The defendants objected to the appraisal on the grounds of bias. After a hearing on their contention, I signed an order on November 7, 1984 which rescinded the prior order for the appraiser and appointed Ruth Cohen, a real estate broker and appraiser with offices in the Sawyer Avenue area to appraise the property. Her appraisal was filed on April 4, 1985 and reflected that as of July of 1974 the property had a value of $40,000, as of June 1978 it had a value of $50,000 and as of the date of the appraisal, April 4, 1985 it was worth $100,000. The Certificate of Reasonable Value obtained by Theresa indicated that as of September 16, 1977 the property had a value of $51,000. Based upon the foregoing, the court finds that the average appraised value of the property between September of 1977 and June of 1978 was $50,500.

## THE SOURCE OF THE FACTUAL INFORMATION DEVELOPED DURING AND BEFORE THE TRIAL: THE RELATIONSHIP BETWEEN THE ATTORNEY FOR THE TRUSTEE AND THE DEFENDANTS

The familiarity of the attorney for the trustee, Philip M. Kovitz, Esq. ("Kovitz"), with the defendants developed over many years of social and business relationships, aptly qualified him to conduct a probe of their involvement in the Sawyer Avenue property. Evidence of that relationship was borne out during the trial which reflected that its genesis took place about 31 years ago in 1957 when he became friendly with Lelia and Theresa before their marriages. They had come to New York from their native Peru. Their mutual friendship

with Kovitz was benefited by his ability to converse with them in Spanish. That led him to meet other members of their family—their parents Dr. Fabio and Mrs. Gastelu, their brother Rolando, and their cousin Alicia Salgado. He visited with them in Peru while Dr. Gastelu and his wife were living there. Later he assisted Lelia in incorporating a Peruvian social club in New York in the course of which he met many of her acquaintances. He represented her in connection with an apartment lease and was her brother's attorney in an accident case. He also represented Theresa in her divorce proceedings from her first husband. Later he became friendly with her second husband, Harry Tesmetges, the debtor and defendant in this proceeding, after they were married.

The Tesmetges were in the real estate business, buying, selling and investing in real property either directly or in the names of corporations in which Harry was a principal. Theresa's investment in the jewelry business, in which Harry had very little interest, proved unsuccessful. His ownership of horses led to substantial judgments against both of them by several horse farms.

In November of 1975 the seed of the breakup of the friendship between Kovitz and the Tesmetges was planted. Kovitz loaned $10,000 to H.T. Thomas Co., Inc., one of Harry's corporations. The loan was secured by a second mortgage on residential property owned by the corporation. After nine months of uninterrupted interest payments at the rate of 18% per annum, the mortgage was wiped out when the first mortgage was foreclosed. Kovitz then sued H.T. Thomas Co., Inc. and recovered a default judgment for $10,487.50 on November 3, 1976. He thereupon instituted an action against Harry and Theresa Tesmetges seeking damages for their alleged fraud in inducing him to loan the money to the corporation. They successfully reopened a default judgment that had resulted in a judgment against them. After bonding the judgment pursuant to an order of the court in which the action had been instituted, nothing of any consequence was done in the action. Although that court directed

that it be set down for trial, it has never been tried.

Because his judgment against the Tesmetges was not legally effective but was bonded, on August 10, 1979 Kovitz induced the Bank of Commerce, a judgment creditor of Theresa for approximately $1,800, to commence an action in the Supreme Court of the State of New York, County of Queens against the Hermans and the Tesmetges, the same defendants in the within action. The action sought to set aside the Hermans' purchase of the Sawyer Avenue property as fraudulent under Article 10 of the Debtor and Creditor Law of the State of New York. An examination of the complaint reflects basically the same grounds as set forth in the instant action before this court except that it did not seek an equitable lien. Kovitz was the attorney for the plaintiff. After considerable time and effort were expended in pre-trial procedure, examinations before trial, motion practice, and the amendment of the complaint, the plaintiff-bank dismissed Kovitz as its attorney early in June of 1980. All further activity in that action then ceased.

On June 30, 1980 Kovitz commenced a new fraudulent conveyance action similar to the Bank of Commerce's action and again very much like these proceedings, except for the equitable lien relief, with the same defendants and two additional defendants namely, Kadilac and New York Guardian Mortgagee Corp., its assignee. The plaintiff in that action was one Prisciliano Quevado as assignee of Pine Hollow Stud Farms, Inc. ("Pine Hollow"). After several motions were made in the action, it ground to a halt upon the filing of the petition in bankruptcy by the debtor on November 28, 1980.

During these proceedings, the court learned that on January 26, 1978 prior to the June 22, 1978 closing and at a time when the Tesmetges and the Hermans were taking steps to buy the house, Kovitz arranged for Quevado, whom he has characterized as his nominee, to pay $1,500 to an alleged representative of Pine Hollow for an assignment of a $7,573.71 judgment it had recovered against the debtor in

March of 1975. The trustee and the court also learned that Kovitz had prepared and filed a proof of claim in this case for Quevado in the sum of $7,573.71, plus interest, in which claim Kovitz had power of attorney. Upon examining the claims filed in this case, the trustee also learned that Pine Hollow had likewise filed a claim for $7,573.71 plus interest. Because of the obvious conflict arising out of the duplication of the claims, one of which provided Kovitz with power of attorney, this court authorized the trustee to act as his own attorney, instead of Kovitz, for the purpose of objecting to both claims in order to determine which, if any, should be allowed. Upon being informed by the attorneys for Pine Hollow as well as by Kovitz himself that the person who had received the $1,500 for the assignment of the judgment to Quevado had no authority to make the assignment, Kovitz withdrew the Quevado claim at this court's direction. The court cannot help but note that had the foregoing fact been known to the defendants when the Quevado law suit was commenced by Kovitz, they could have successfully moved to have it dismissed because of Quevado's lack of standing.

Kovitz's intimate knowledge of the debtor's affairs contributed to his employment as the attorney for the trustee in this case. The trustee informed this court during the trial that he and Judge Price were told by Kovitz shortly after the trustee was appointed that he, Kovitz, was a creditor of the debtor, and that his knowledge of the debtor's affairs, acts and conduct, favored his employment as the trustee's attorney to assist him in administering the estate. Section 327(c) of the Bankruptcy Code, as it was in effect at that time, provided that a person was not disqualified from such employment solely because of his representation of a creditor but could not, while so employed, represent a creditor in connection with the case. Satisfied that Kovitz's employment by the trustee did not violate the statute, Judge Price properly authorized his retention. Proceedings brought by the trustee are pending in this case to determine whether or not Kovitz actually is a creditor of the debtor.

### JUDGE PRICE'S FINDINGS OF FACT

As was noted at the very outset, the countless tiles of circumstantial evidence arising out of facts developed during the trial are now ready to be put together to form a mosaic of ultimate decision. In weighing the facts the court is mindful that on May 22, 1984 when Judge Price denied the motions of the plaintiffs and defendants for summary judgment, the trustee submitted to him 66 findings of fact. The defendants objected to the findings on the ground that a motion for summary judgment does not call for findings of fact and also because many of the proposed findings had not been established at that time. Apparently, Judge Price intended to narrow the issues by setting forth facts which could be agreed upon as well as facts to be determined during the course of trial, as is generally done in a pre-trial order although there was no pre-trial order.

Judge Price's order denying the motions for summary judgment set forth 23 of the 66 findings submitted to him by the trustee. Several of the findings were basic and required no proof. For example: the Tesmetges were husband and wife; the Hermans were husband and wife; Theresa and Lelia were sisters; Alicia Salgado is a first cousin of Theresa and Lelia; the Tesmetges were tenants under the lease; the Tesmetges would have to vacate the premises or cease to have the rights to reside there; and the option credits at closing amounted to approximately $4,800. Conversely, others consisted of findings which were not established during the trial before me. For example: there was no written assignment whereas there was; the lease under which the Tesmetges occupied the premises ran for five years whereas it ran for two years; the Hermans paid nothing at the closing whereas at that time they paid $1,500 and $375 for the Tesmetges, representing rent and other charges due from them, as well as over $5,000 for their own account for closing costs.

In view of the fact that many of the findings contained in Judge Price's order of May 22, 1984 were not supported by evi-

dence which did not develop until the trial before me, I find that the findings do not qualify at this time to be deemed findings of fact in rendering a decision of the issues presented to the court for its determination. The findings of fact made by me as a result of my participation in the trial of this action are set forth throughout this opinion.

## ISSUES

I. Was the acquisition of title by the Hermans the result of a fraudulent transfer?

II. Do the facts justify a finding that the Sawyer Avenue property be impressed with an equitable lien in favor of the trustee?

## I

## THE ACQUISITION OF TITLE BY THE HERMANS

It is the trustee's contention that the execution of the contract of purchase by Theresa accompanied by her assignment of it to the Hermans represented a transfer of property in which she and the debtor had an interest, that it was made by her on behalf of herself and the debtor with no consideration to either of them at a time when she and the debtor were insolvent, with knowledge of such insolvency by the Hermans. He further contends that it was made with intent to hinder, delay and defraud the debtor's creditors. Thus the trustee claims that the transfer constituted a fraudulent conveyance under Article 10 of the Debtor and Creditor Law of the State of New York. The trustee does not claim that there was a transfer of the house, inasmuch as the Tesmetges never owned it. His attack is directed to the instrumentalities by which the Hermans acquired title, that is, the contract of purchase and its assignment.

## THE TRANSFER

### A. Was property of the debtor transferred?

Section 544(b) provides the trustee with the right to avoid a transfer of a debtor's interest in property if the transfer is voidable under applicable law. The trustee contends that the Debtor and Creditor Law of the State of New York requires this court to hold that the assignment of the contract of purchase constituted a fraudulent conveyance. The pertinent sections he relies on are 272, 273, 273(a) and 276.

Section 273 designates as fraudulent, transfers made by an insolvent transferor for inadequate consideration:

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Section 272 provides that fair consideration is given for property, or obligation,

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

Section 273(a) relates to transfers made without fair consideration at a time when the transferor is a defendant in an action for money damages:

Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

Finally, section 276 relates to transfers made with actual fraudulent intent:

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either

present or future creditors, is fraudulent as to both present and future creditors.

■ A reading of the foregoing sections implies that a fraudulent conveyance requires that the transferor convey its property. The defendants contend that the assignment of the contract did not carry with it a transfer of the debtor's interest in property. This court finds their argument unpersuasive.

As noted early in this opinion, when the lease was not renewed and it expired, the benefits which the option had offered the Tesmetges as tenants expired with it. *See Lazarus v. Flourney, supra.* Nevertheless, even though the lease was not renewed and the option had died, the Dases continued to treat the Tesmetges as tenants and from the facts which have been discussed, they also extended them the opportunity to buy the house under the same terms as provided for by the option. In the stipulation of the settlement of the dispossess proceedings which they entered into in March of 1978 with the Tesmetges, the word "tenants" is employed throughout. Although paragraph 4 of the stipulation recites that the *tenants* had an option to purchase the premises and further states that the option was exercised and a contract entered into between the parties, the facts clearly show that the option had not been exercised although a contract had been entered into between the parties. From the facts reviewed by the court, the contract refered to was the one dated December 29, 1977 wherein Theresa had been designated as the purchaser. Nevertheless, paragraph 5 of the stipulation indicating that there was a default under the terms of the contract stated that the sellers were willing to reinstate the same and referred to them as the *purchasers*. Paragraph 6 of the stipulation which provided for a new contract referred to the *tenants* with whom the landlord would enter into a new contract, or with *their* assignee. It is to be noted parenthetically that reference in that paragraph to the right of the assignee to apply for a GI mortgage is indicative of the fact that Bernard Herman who was the only veteran involved was undoubtedly the assignee contemplated. The remaining paragraphs of the stipulation intended that the *tenants* or the assignee be obligated under its terms.

The wording of the assignment of April 5, 1978 contributes further to the confusion as to the identity of the assignee where it refers to the assignment of the interest of the "purchasers" not the "purchaser," although only Theresa signed it as purchaser.

From all of the foregoing the court finds that Harry Tesmetges, the debtor herein, had the same rights as Theresa arising out of their mutual tenancy while they were residing on the premises as husband and wife. This identity of interest gave him the right to participate in the disposition of their mutual interest in the premises by either purchasing it under a contract which incorporated the favorable option terms or to assign such interest with his wife as long as the Dases consented to either transaction. Until the landlord consented to either, their interest was inchoate and had no value. When the landlords agreed to the sale of the house as manifested by the contract which they entered into on December 29, 1977 albeit with Theresa alone, they ratified their intent to sell it to the *tenants* as *purchasers*, as expressed in the March 1978 stipulation. Thus the mutual interest of Harry and Theresa constituted a potential asset for both. Again when the April 5, 1978 contract was entered into solely with Theresa, the debtor had a similar contingent property right arising out of it. Such contingent interest finally became fixed after the contract had been assigned to the Hermans and they proceeded to close title.

The fact that neither Theresa nor the debtor were financially able to buy the house is not material to whether a property interest of the debtor was transferred. By entering into the contract of sale, Theresa was able to assign it to the Hermans and enable them to buy the house. The assignment gave the Hermans something which had value to her and Harry: the opportunity to buy the house at a favorable market price and with credits worth about $4,800.

Both were jointly entitled to the amount of the credits the Hermans acquired at the closing.

By reason of all of the foregoing the court finds that when Theresa entered into the contract as purchaser she did so on behalf of herself as well as on behalf of the debtor. The trustee's contention to that effect is sustained. The court further finds that the debtor's interest in the December 29, 1978 contract which was assigned to the Hermans constituted property of the debtor which was ultimately conveyed to the Hermans.

Section 541 of the Bankruptcy Code provides in pertinent part that property of the estate includes: "Any interest in property that the trustee recovers under section ... 550 ... of this title." Section 550 states in pertinent part that "to the extent a transfer is avoided under section 544 ... the trustee may recover ... the property transferred, or ... the value of such property, from—(1) the initial transferee ... or (2) any immediate or mediate transferee of such initial transferee." Whether the trustee has established the right to such a recovery is considered in the following discussion.

B. Did the transfer of the debtor's interest constitute a fraudulent conveyance under the New York Debtor and Creditor Law?

1. *Was there fair consideration for the transfer?*

█ As has been noted in discussing the provisions of § 273, if the transfer of the debtor's property was made at a time when he was insolvent, it is fraudulent as to his creditors without regard to his actual intent if the transfer had been made without fair consideration.

From the court's analysis of the debtor's financial condition at the time the contract was assigned to the Hermans, it finds that the debtor was insolvent when the transfer took place.

The issue which the court must determine is whether the transfer of the contract to the Hermans was made without fair consideration. *Orbach v. Pappa,* 482 F.Supp. 117 (S.D.N.Y.1979).

The court has previously referred to § 272(a) which provides that fair consideration is given for property when in exchange for such property as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied. Thus, an equivalent exchange of value and also good faith are required. If there is a fair exchange of value absent good faith, the transfer may be set aside. *Julian J. Studley, Inc. v. Lefrak,* 66 A.D.2d 208, 412 N.Y.S.2d 901 (2d Dept.), *aff'd,* 48 N.Y.2d 954, 425 N.Y.S.2d 65, 401 N.E.2d 187 (1979). Where a transfer involves a family transaction, the transferee bears the burden of proof that the transfer was made with fair consideration. *ACLI Government Securities, Inc. v. Rhoades,* 653 F.Supp. 1388 (S.D.N.Y.1987), *aff'd,* 842 F.2d 1287 (2d Cir.1988); *Orbach v. Pappa, supra; Sahley v. Tipton Co.,* 264 F.Supp. 653 (D.Del.), *aff'd,* 386 F.2d 450 (3d Cir. 1967); *Liggio v. Liggio,* 53 A.D.2d 543, 385 N.Y.S.2d 33 (1st Dept. 1976).

(a) Was the transfer made in good faith?

It has been held that to show good faith a transferee must demonstrate 1) an honest belief of the propriety of the activities in question, 2) no intent to take inconscienable advantage of others, and 3) no intent or knowledge of the fact that the activities in question will hinder, delay or defraud others. *Southern Industries, Inc. v. Jeremias,* 66 A.D.2d 178, 411 N.Y.S.2d 945 (2d Dept.1978).

An examination of the foregoing necessary alternative factors leads this court to find that the defendants had an honest belief in the propriety of the activities in question, there was no intent to take advantage of anyone, and that although the Hermans had knowledge of the insolvent condition of the Tesmetges, they had no intent to, or knowledge of the fact that the transfer would hinder, delay or defraud their creditors. *See Spear v. Spear,* 101 Misc.2d 341, 421 N.Y.S.2d 277 (Sup.Ct. 1979).

Good faith is required of both transferor and transferee. Although good faith may be lacking where the transferee has knowl-

edge of the transferor's unfavorable financial condition at the time of the transfer, the court should examine into the transaction so as to determine whether or not there actually was an absence of good faith. *In re Checkmate Stereo and Electronics Ltd.*, 9 B.R. 585 (Bkrtcy.E.D.N.Y. 1981), *aff'd*, 21 B.R. 402 (E.D.N.Y.1982).

When the lease and the option expired, the Dases were relieved of the requirement to sell the property to the Tesmetges under any terms. It was the decision of the Dases, not the Tesmetges, to extend those benefits to any purchaser. Whether the Dases could have sold the house for more than $50,500 or whether they believed it was easier to sell it because of the substantial credits available, the court finds that by agreeing to the March 18, 1978 dispossess settlement the Dases committed themselves to sell the house according to the terms of the stipulation. The court also finds that the stipulation permitted them to sell it to an assignee of the prospective purchaser or purchasers. The court accepts as true the testimony of the defendants that the Tesmetges did not have the money to pay the first $2,000 rent arrears required by the stipulation as a condition to a new contract, that the Hermans paid it, and that the Dases, by their attorney, Brown, had reason to know that the Hermans were the intended assignees. Were it not for the Hermans' payment of that initial installment of arrears, the right to buy the house would have been lost and there would have been no new contract. The ultimate decision to buy the house was strictly that of the Hermans. The purchase was not intended to be an investment in the property, speculative as to its appreciation or depreciation. It was made solely in order that Lelia's family consisting of her parents, her brother, her cousin, her sister and her husband Harry, would be able to continue to live in the house inasmuch as they collectively were unable to buy it. Had the Hermans not bought it, somebody else would have. They had no reason to let it go. It was their decision, not that of the Tesmetges, to obligate themselves to the payment of the $49,500 mortgage with interest over 30 years and

to pay the costs and expenses of sale at the closing which the record shows amounted to more than $5,000, as well as to pay the rent due from the Tesmetges.

The court finds that although the Hermans had knowledge of the unfavorable financial condition of not only the debtor but of Theresa as well, their acquisition of the property was not part of a scheme or conspiracy to place the property beyond the reach of the debtor's creditors.

Lack of good faith imports a failure to deal honestly, fairly and openly. *Southern Industries, Inc. v. Jeremias*, 64 A.D.2d 178, 411 N.Y.S.2d 945 (2d Dept.1978). The court finds that the trustee has failed to prove that the debtor, his wife, and the Hermans did not deal honestly, fairly and openly in effectuating the transfer. It further finds that there was no absence of good faith as to the debtor, his wife and the Hermans.

(b) Was there equivalent value for the transfer?

In determining whether a transfer is fraudulent it is necessary to look to its effect on the debtor's estate. "The touchstone is the unjust diminution of the estate of the debtor that otherwise would be available to the creditors." G. Glenn, *The Law of Conveyances*, § 195 (1931).

This court finds that as alleged in the "further amended complaint" and as established at the trial, the total credits received by the Hermans at the time they acquired title to the house amounted to about $4,800. On the other hand, the court finds that in addition to the $2,000 which it concludes was paid by the Hermans on behalf of the Tesmetges for the rent due them in accordance with the dispossess settlement, the Hermans also paid $1,500 for them at the closing which represented three months rent due from the Tesmetges at that time. The Hermans also paid $375 due from Tesmetges at the closing. Thus, the Hermans paid a total of $3,875 on account of the Tesmetges' obligations.

Although the Hermans and Theresa Tesmetges were of the belief that the Hermans had also paid the balance of $1,500

due under the settlement stipulation in addition to the $1,500 in rent arrears paid by them at the closing, their explanation as to its payment is too vague for the court to accept as a given fact. They may have paid it but they did not appear to be completely certain. Lacking more than that belief, the court cannot accept their statements as evidence. However, as stated above, even absent more definite proof of the payment of the initial rent arrear installment of $2,000, the court finds that the Dases would not have gone forward with the new contract and accepted the Hermans as assignee had they not paid the $2,000. The court finds that the Tesmetges did not have the wherewithal to pay it and that they did not pay it.

Simple arithmetic reflects that by receiving credits of about $4,800, after paying $3,875 for the Tesmetges, there was a balance of $925 which the Hermans would have had to pay to the Tesmetges to have provided the equivalent value for the transfer. Inasmuch as the debtor as a co-tenant had a one-half interest in the credits and the balance of $925, the amount he was entitled to receive was $462.50.

Section 272(b) provides, *inter alia,* that fair consideration is given for the property transferred where the amount is not disproportionately small as compared to the value of the property. *Corbin v. Litke,* 105 Misc.2d 94, 431 N.Y.S.2d 800 (Sup.Ct. 1980).

As was pointed out by Judge Kearse in *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 8 B.C.D. 297 (2d Cir. 1981), the trustee should not take too narrow a view of the fair consideration requirement. As stated by her:

> If the consideration given ... confers an economic benefit upon the debtor, then the debtor's net worth has been preserved ... provided, of course, that the value of the benefit received by the debtor *approximates* the value of the property or obligation he has given up.

661 F.2d at 991–92 (emphasis added); *see In re Augie/Restivo Baking Co., Ltd.,* 87 B.R. 242, 247 (Bkrtcy.E.D.N.Y.1988); *In re Ward,* 36 B.R. 794 (Bkrtcy.S.D.1984); *In re Euro–Swiss Int'l Corp.,* 33 B.R. 872, 11 B.C.D. 113 (Bkrtcy.S.D.N.Y.1983); *In re Missionary Baptist Fund of America, Inc.,* 24 B.R. 973 (Bkrtcy.N.D.Tex.1982).*

The court finds that the amount received by the Tesmetges from the Hermans was not disproportionately small and approximated the value of the transfer.

The court further finds that the purchase price paid by the Hermans when they acquired the premises for $50,500 represented the average appraised value of the property as found in the appraisals hereinabove referred to. The fact that the property was deemed to have a value of about $100,000 in 1985 by the appraiser appointed by this court does not affect its adequate value for the purpose of determining whether there was a fraudulent transfer. The relevant date for determining fairness of consideration is the date of the transfer. *In re Appomattox Agri–Service, Inc.,* 6 B.C.D. 1239 (Bkrtcy.W.D.Va.1980); *see In re Newman,* 15 B.R. 658, 8 B.C.D. 678 (S.D.N.Y. 1981).

Under § 273 where the debtor conveys property when he is insolvent or is rendered insolvent by the transfer, the transfer will be deemed fraudulent only if the debtor fails to receive fair consideration. *In re Alston,* 49 B.R. 929 (Bkrtcy.E.D.N.Y. 1985).

After reviewing all of the facts relating to the transfer the court finds that the debtor received fair consideration for the transfer.

### 2. Was the transfer made with actual fraudulent intent?

■ The argument contained in the trustee's complaint as finally amended is that the transfer was made with actual fraudulent intent and is avoidable pursuant to § 276 of the New York Debtor and Creditor Law, *supra.*

Clear and convincing evidence is required of the trustee who has the burden of establishing actual fraud. *ACLI Government Securities, Inc. v. Rhoades,* 653 F.Supp. 1388 (S.D.N.Y.1987), *aff'd,* 842 F.2d 1287

(2d Cir.1988); *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 508 N.Y.S.2d 17 (2d Dept.1986), *appeal dismissed*, 69 N.Y. 2d 875, 514 N.Y.S.2d 1029, 507 N.E.2d 322 (1987).

Although the statute speaks in terms of the debtor's intent, authority exists for imputing the intent of the transferee on to the debtor where the transferee was in a position to dominate or control the debtor at the time of the transfer. *In re Cushman Bakery*, 526 F.2d 23 (1st Cir.1975), *cert. denied*, 425 U.S. 937, 96 S.Ct. 1670, 48 L.Ed.2d 178 (1976). This court finds that the transferees did not dominate or control the debtor at the time of the transfer.

Because actual intent is difficult to prove directly, the courts have adopted certain "badges of fraud" as evidence of actual intent. *In re Kaiser*, 722 F.2d 1574, 11 B.C.D. 529 (2d Cir.1983); *In re Jones*, 67 B.R. 484 (Bkrtcy.W.D.Mo.1985).

Badges of fraud have been found to include the following:

1. Conveyance of all of the debtor's property

2. Retention of possession of the property by the debtor, although title exists in another entity

3. Secrecy of the conveyance

4. Existence of a trust between the debtor and the person to whom the property was conveyed

5. Conveyance of the property while a suit against the debtor is pending

6. The instrument affecting the transfer suspiciously states that it is in fact bona fide

7. Consideration for the transfer is inadequate

8. The debtor makes a gift to a family member.

When established through either testimony or documentary evidence, each of the foregoing criteria furthers the case for actual intent. *See In re Kaiser, supra.* In addition and apart from the plaintiff's burden of establishing intent, a defendant must also establish the reasonableness and legitimacy of the conveyance. *United States v. Gleneagles Investment Co.*, 565

F.Supp. 556 (M.D.Pa.1983), *aff'd sub nom., U.S. v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986), *cert. denied sub nom., McClellan Realty Co. v. United States*, — U.S. —, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987).

The trustee was given considerable latitude and failed to establish by circumstantial evidence "badges of fraud" to prove actual intent to defraud.

As for badge of fraud #1, this court finds that although the transfer of the debtor's interest in the contract constituted an interest in property worth one-half of the $4,800 in credits, or $2,400, he had other nominal assets consisting of stock in corporations he controlled as set forth in his bankruptcy schedules having a value of $6,650. Thus, the transfer did not constitute a conveyance of all of his property.

As for badge of fraud #2, the assignment of the contract which allowed the Hermans to acquire the property was not accompanied by the debtor's retention of the property. The other members of the family lived there with him and his wife until he left in November of 1982. That did not constitute conduct which would reflect his retention of possession of the property. This badge of fraud is usually applicable where real property has been transferred. That is not the situation in this case.

A debtor's transfer of property to secure antecedent debt is not unlawful unless the debtor retains some dominion contrary to the transfer or otherwise has benefit which the law does not sanction. *Irving Trust Co. v. Kaminsky*, 19 F.Supp. 816 (S.D.N.Y. 1937). The court finds that the debtor did not retain any dominion over the property or otherwise benefit from the transfer in any manner which contravenes any legal sanctions.

The question of fraud is one of fact, and it arises when the vendee is required to show a valid excuse for leaving the property in the vendor's possession. *Vogedes v. Beakes*, 38 A.D. 380, 56 N.Y.S. 662 (1899). The facts demonstrate that the Hermans did not leave the property in the vendor's possession. They had a valid reason to

leave the property in the possession of the family members, including the debtor for several years. *See In re Cushman Bakery*, 526 F.2d 23 (1st Cir.1975), *cert. denied*, 425 U.S. 937, 96 S.Ct. 1670, 48 L.Ed.2d 178 (1976).

As for badge of fraud # 3 dealing with secrecy of a conveyance, the courts are likewise concerned with that act as a badge of fraud where the transfer of property was made without notice of the transfer. Although this badge of fraud generally relates to the transfer of real property, in the instant case the existence of the contract between the Dases and Theresa Tesmetges and its assignment as well as the modified contract entered into between the Dases and the Hermans, were fully disclosed at the closing. The court finds that neither the debtor nor his wife Theresa participated in a secret conveyance.

The trustee has not proved and the defendants deny that there was a trust between the Tesmetges and the Hermans whereby it was agreed that the property would be conveyed to the Tesmetges at some future date, as called for by badge of fraud # 4.

As for badge of fraud # 5 which deals with a conveyance made while a suit is pending against the transferor, the only suit at that time was the action brought by Kovitz against the Tesmetges for alleged fraud arising out of his loan to H.T. Thomas Co., Inc. That action is still pending in the state court. However, in adversary proceedings brought by Kovitz in this court to determine the dischargeability of that fraud claim against the debtor, this court has held that there was no fraud. *See In re Tesmetges*, 74 B.R. 911 (Bkrtcy.E.D.N.Y. 1987), *aff'd*, 86 B.R. 21 (E.D.N.Y.1988). Consequently the action in the state court will undoubtedly be dismissed on the grounds of *res judicata.*

As to the 6th badge of fraud, the court finds that the contract of sale and assignment effecting the transfer does not suspiciously state that the transfer was in fact bona fide. As a matter of fact, this court finds that the transfer was in fact bona fide.

As to badge of fraud # 7 this court has found that the consideration for the transfer was substantially adequate.

Finally, badge of fraud # 8 which refers to the making of a gift to a family member was not established by the facts. The debtor made no gift of the contract which ultimately led to the acquisition of the house by the Hermans. The court has found that the Hermans paid fair consideration for the transfer. It is also mindful that in purchasing the house, the Hermans obligated themselves by the $49,500 mortgage which they have been paying on a monthly basis since the closing.

The facts in the instant case in no way resemble the type of transfer of property by a debtor to a member of his family while insolvent and while retaining the use and enjoyment of the property, all of which would be classic badges of fraud. *See In re Cadarette*, 601 F.2d 648, 5 B.C.D. 444 (2d Cir.1979). The facts in *Kaiser*, 722 F.2d 1574, 11 B.C.D. 529 (2d Cir.1983), are equally completely alien from those in the present action. In *Kaiser* that situation presented badges of fraud which led the court to find that there was a fraudulent conveyance. There, while insolvent, Kaiser purchased two homes with his own money but had title to both placed in the name of his wife who provided no consideration for the transfers. Kaiser retained the possession, benefit and use of the properties and treated them as his own. He created dummy corporations in order to hide his assets and conceal those assets from his trustee in bankruptcy. As was pointed out by the Second Circuit in *Kaiser*, that "scenario truly indicates a scheme to defraud creditors." The facts in the instant case nowhere approach or even resemble the fraudulent acts committed by Kaiser. This court finds that there were no acts which were committed by the defendants which would place them within the sphere of the acts which the *Kaiser* court decried. *See In re Fill*, 82 B.R. 200 (Bkrtcy.S.D.N.Y. 1987).

**700**

This court finds that the trustee has failed to prove actual fraudulent intent as required by § 276 through the use of "badges of fraud." *See In re Freudmann,* 362 F.Supp. 429 (S.D.N.Y.1973), *aff'd,* 495 F.2d 816 (2d Cir.1974), *cert. denied,* 419 U.S. 841, 95 S.Ct. 72, 42 L.Ed.2d 69 (1974); *In re May,* 12 B.R. 618 (Bkrtcy. N.D.Fla.1980).

In an action by a bankruptcy trustee to set aside a transfer as being fraudulent, fraud must be proved by convincing evidence whether it be direct or circumstantial. *Cooper v. Maurer,* 37 N.Y.S.2d 992 (Sup.Ct.1942). Though it may be established as a deduction from facts, they must not be ambiguous. If taken together they are consistent with an honest intent, the fraud is not established. *Roberts & Co. v. Buckley,* 145 N.Y. 215, 39 N.E. 966 (1895).

After considering all of the facts and the proof established, this court finds that the defendants did not participate in a fraudulent conveyance under Article 10 of the Debtor and Creditor Law of the State of New York.

## II

### THE EQUITABLE LIEN

A. Do the Facts Justify a Finding That the Sawyer Avenue Property Be Impressed With An Equitable Lien In Favor Of The Trustee?

The trustee's final prayer for relief is for an equitable lien on the Sawyer Avenue property in the sum of $49,790. He claims that such amount represents: payments allegedly advanced by the defendants Tesmetges on account of the mortgage loan for the period commencing with the first mortgage payment in July of 1978 to the date the further amended complaint was filed on August 6, 1985; the option credits amounting to $4,800; $500 for attorneys' fees; closing fees of $950; about $2,500 for "points" and approximately $41,040 for the total mortgage interest, principal, land taxes, water and sewer charges.

The trustee further contends that the foregoing sum arises out of contributions and maintenance of the premises by Harry and Theresa for the benefit of the Hermans and should be an equitable charge or lien on the property.

This is not the only action brought in this bankruptcy case by Kovitz as the attorney for the trustee to impress an equitable lien or to set aside a fraudulent conveyance. He initiated another such action before Judge Price on February 3, 1982 after the instant action was filed on August 31, 1981. Except for several procedural motions addressed to the answers in this action, he took no further steps to proceed to trial but went forward with the trial of the second action.

The property which was the subject of the second action was located in Jamaica, New York and was owned by the debtor's sister. The complaint alleged that the debtor had an interest in the property which was fraudulently conveyed. It was amended to seek to have the property impressed with an equitable lien arising out of mortgage payments traced to the debtor as far back as 1972 under a mortgage affecting the property. Kovitz abandoned the fraudulent conveyance portion of the complaint during the trial and pressed for the equitable lien. The court notes that the original complaint in the instant action likewise did not seek an equitable lien. But when Judge Price's decision, affirmed by Hon. Thomas C. Platt, D.J. on December 18, 1984 (*In re Tesmetges,* 47 B.R. 385 (E.D.N.Y.)), held that the trustee had an equitable lien on the Jamaica property for $18,000, Kovitz thereafter on December 28, 1984 amended the complaint in this action to include the equitable lien relief. If this court is correct in its conclusion that there was no fraudulent conveyance here, the only relief left to the trustee is the one where he seeks an equitable lien as was the situation in the Jamaica property action.

It is necessary to look to New York State law to determine whether the debtor retained an equitable interest in the property. Under New York law, relief in equitable lien actions is to rectify fraud. *Saulia v. Saulia,* 31 A.D.2d 640, 295 N.Y.S.2d 980 (2d Dept.1968), *modified on other grounds,* 25 N.Y.2d 80, 302 N.Y.S.2d 775,

250 N.E.2d 197 (1969). An equitable lien may arise from circumstances which would imply that there had been an agreement between the parties whereby the payments for the purchase price of the property, as well as the mortgage payments, were not made by the legal owner but were made by the transferor of the property. As pointed out by Judge Platt in his decision affirming Judge Price: "This is particularly so where the person claiming the lien has made payments from his or her own funds for closing costs, reduction of the mortgage and improvements on the property." As Judge Platt further noted: "There are many instances where equity will enforce a lien on property without an express agreement of the parties which represents an application of equitable principals." Thus, the requirement that there be a finding of an agreement based upon an oral promise to convey may be implied from the circumstances. *Goldrick v. Goldrick*, 99 Misc.2d 749, 417 N.Y.S.2d 410 (Sup.Ct.1979). Absent a promise either written or oral to convey the property, the court will sustain the right of a plaintiff for an equitable lien by proof derived from the circumstances. *Collucci v. Collucci*, 86 A.D.2d 644, 447 N.Y.S.2d 22 (2d Dept.1982), *rev'd on other grounds*, 58 N.Y.2d 834, 460 N.Y.S.2d 14, 446 N.E.2d 770 (1983).

The trustee has failed to prove that there was an agreement, oral or otherwise whereby the Hermans had an understanding with the Tesmetges that they would convey the property to them in the future. Nor has the trustee established any proof that the Tesmetges have exerted dominion and control over the property which has been one of the elements of the ownership of the property by the Hermans.

In the Jamaica proceeding the trustee proved that the mortgage payments which gave rise to the equitable lien in that action were derived from the debtor. In the instant action the trustee has failed to establish either by direct or indirect evidence or by circumstantial evidence that the debtor or his wife, Theresa, acting on his behalf, made any of the monthly mortgage payments. The obligation to make the payments was assumed entirely by the Hermans at the closing when they subjected themselves to pay the bond and mortgage. The trustee has not proved that they did not make the payments.

The trustee has likewise failed to prove his contention that Alicia Salgado was the nominee or surrogate of Theresa, or that Alicia was the source of the funds and acted as a conduit for the monthly mortgage payments. He was also unable to prove that Theresa was financially able to make the mortgage payments by reason of her relationship with Eldorado Creations, Inc. ("Eldorado"), a company engaged in the jewelry business of which Alicia and one David Montilla were the principals. He further failed to establish that Theresa was either the alter ego of Eldorado or had a pecuniary interest in its affairs sufficient enough to warrant the presumption that she had been the source of the mortgage payments made by the Hermans.

The trustee further did not prove, as he contended, that the contributions made by Theresa, her brother Rolando, her cousin Alicia, and for a while, her husband up to the time he left the premises in November of 1982, were actually derived from Theresa acting for the debtor or from the debtor himself. He has also failed to prove that monthly checks drawn by Alicia to the order of Bernard Herman several months after the closing from January to July of 1979, as well as a check drawn on Theresa's father's account, all for the exact amount of the monthly mortgage payment, came from the debtor or Theresa.

The trustee's argument that the Hermans bought the property out of funds provided by the Tesmetges has no merit. The facts surrounding the closing of title reflect that the sum of $49,050 was made available to the Hermans by the mortgagee by reason of their obligating themselves to pay that sum plus interest at the rate of 9% per year for 30 years. The credits which the Hermans received amounting to about $4,800 were paid for by them at least to the extent of $3,875. The court finds that the closing costs charged to the Hermans, including the points representing the mort-

gage discount, were paid by the Hermans and not by the Tesmetges.

On the basis of all of the proof adduced during the trial, both direct as well as circumstantial, and upon the court's acceptance of the credibility of the defendants as hereinafter set forth, the court finds that the defendants did not commit any act which supports the trustee's claim to an equitable lien.

### B. The Credibility of the Defendants

Allegations in the "further amended complaint" and the trustee's line of questioning during the trial were aimed at the veracity and credibility of the defendants. As has already been pointed out, Kovitz's familiarity with the past history of the defendants and their affairs was of invaluable assistance in that regard.

He established that during the course of their real estate dealings, both Harry and Theresa used different names. As appears from the very caption of this bankruptcy case, Harry was also known as Theoharis Tesmetges, Harry Thomas, and Henry Best. Harry's response was that people with whom he did business had difficulty in pronouncing his name or writing it. Kovitz was able to show that after Henry Best had died Harry used Best's name in connection with many business transactions. Harry testified that his use of the name Henry Best resulted from his buying Best's real estate business from his widow. He further testified that those names he went by facilitated him in soliciting and engaging in real estate transactions and was not intended to deceive or perpetrate a fraud on anyone.

Insofar as Theresa is concerned, Kovitz proved that while she was engaged in the real estate business she participated in many transactions where she used her maiden name, Gastelu, or her previous married name, Goldstein. Her response was that it was customary for her to use those names in her ordinary business transactions and that they were not used for the purpose of defrauding anyone.

Kovitz produced a copy of an application for a home improvement loan made in April of 1974 for the Sawyer Avenue house which bore the signature of Terry Gastelu, and which stated she was single and was the owner of the house. At that time she and Harry were married and both were tenants in the house. In response to questioning by Kovitz, she testified that while she believed the signature was hers, she further testified that she had no recollection of providing the information in the application, that the answers to questions in the application were not in her handwriting, but that she did remember purchasing items for the improvement of Sawyer Avenue as a tenant and that the purchase had been financed as a home improvement loan by the Bank of Commerce.

Kovitz's examination of witnesses and the Tesmetges filled hundreds of pages in testimony in his efforts to establish that Theresa had an interest in Eldorado. She testified that she worked there on a commission basis and managed the business. As has been noted, Kovitz's aim was to establish by circumstantial evidence that she derived sufficient income from Eldorado to make the mortgage payments directly, or indirectly from funds secured from Alicia. With that purpose in mind he subpoenaed Eldorado to produce its books and records. He also subpoenaed its banks for copies of its monthly statements, cancelled vouchers, deposit slips, and corporate resolutions. Although the court permitted him to subpoena Eldorado's bank records to establish the corporate structure of the company, after hearing the attorney for Eldorado in opposition to the subpoenas and for a protective order, it quashed the subpoenas which sought the production of the books and records, bank statements, cancelled vouchers and deposit slips. Instead, the court directed that Eldorado make available to it for an in-camera examination, all of its checkbooks, cancelled vouchers, bank statements and daily cash slips in order to determine whether any monies were received by Eldorado from the Hermans, whether any monies were paid by Eldorado to the Hermans or to their mortgagee, and the extent of any funds received by Theresa and Alicia. The court appointed Stuart P. Gelberg, Esq., an offi-

cial Chapter 13 trustee of this court, to assist in its in-camera examination by making an independent examination of the records. Mr. Gelberg ultimately prepared and filed with this court and furnished Kovitz and the trustee a report of his examination setting forth a schedule of all cash, checks for cash, and checks made payable to either Alicia Salgado or Theresa. The schedule reflected the most minimum of cash payments to them. In no way did the payments approximate sums which could be deemed the source of any of the mortgage payments. Nor did the records reflect the receipt of any monies to or from the Hermans or to their mortgagee.

Kovitz also caused to be read into the record excerpts of transcripts of prior testimony taken early in this case in hearings under § 341, examinations under Bankruptcy Rules 205 and 2004, and in this proceeding before Judge Price as well as in the state court actions, by which he sought to highlight alleged contradictory statements by all of the defendants.

As for Bernard and Lelia Herman he proved that statements made by them varied regarding the reason for the purchase of the house; at times they stated that they had intended to reside there, at other times they stated that they bought it primarily for Lelia's family. Their response was that they originally wanted to reside there. However, they changed their minds when they realized that it would be most inconvenient to live in the house with the rest of the family and so they decided to buy it under the favorable terms which were available to them, with the assurance that the family members living there would assist with the mortgage payments by way of their contributions.

Kovitz introduced into evidence a lease in which Eldorado's name was typed in as the tenant but signed by Lelia Herman individually and not in any official capacity for Eldorado. Her explanation for that act was that she had been looking for a store in which to operate a travel agency, that Theresa told her about the availability of a store which Eldorado had been negotiating with the landlord to rent and that when she executed the lease she did so solely in her own name and not as a representative of Eldorado. She further testified that when she learned that the store did not have the facilities required for operating a travel agency, she lost all interest in renting it. Eldorado then went into possession of the premises as tenant. She had no further dealings with the landlord.

The court is aware that many of the incidents and questions asked of the defendants related to matters that occurred many years ago. There is no question but that their memories of those incidents were clouded which created some doubt as to those explanations. The court recognizes that there were variances in their testimony which raised questions as to the reliability of their responses. However, it finds that those situations and incidents were not sufficient enough to affect their credibility as to the issues in this action. Having studied the demeanor of the defendants during the course of this trial, the court is of the opinion that they had no intentions of lying about those incidents and acts as to which they testified.

In response to the trustee's offer of proof as to the defendants' character or traits of character as reflected by their use of various names and other acts which they committed and which were the subject of his attack, the defendants provided proof by testimony as to their reputation for truthfulness and good character as permitted by Federal Rules of Evidence 405. In considering and passing upon such testimony the court was guided by Rule 608(a) which provides:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: 1) the evidence may refer to character for truthfulness or untruthfulness, and 2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

Thus, affirmative evidence of good character, such as truthfulness, to bolster a witness's credibility is admissible only if an

attack is made on the witness's truthful nature in general, as was done in this trial. It has been suggested that this is so because it is both unnecessary and unwise to encumber the trial with a potential morass of such evidence unless character per se is disputed. *See* Advisory Committee's Notes to Rule 608.

A witness's truthfulness can be inquired into by evidence of character traits which are indicative of the person's truthful nature. Such evidence has traditionally consisted of testimony concerning the witness's reputation for truth and integrity. *Conley v. Meeker*, 85 N.Y. 618 (1881); J. Prince, *Richardson on Evidence* 495 (10th ed. 1973).

In pursuit of the foregoing, the defendants produced character witnesses who testified as to their integrity and reputation for the truth.

A biological technologist testified that he had known the Hermans for 25 years and Lelia longer, going back to when they were both in Peru. He stated that he knew many people who also were acquainted with them, that none of them ever knew the Hermans to lie and that they have the highest reputation for truth and veracity.

Another witness, a co-worker of Bernard Herman, testified that he has a reputation for honesty, and is respected for his integrity by his co-workers.

Another witness, a school teacher, testified that she has known the Hermans for 20 years, worked in a hospital with Lelia, and that all who have had contact with them have the highest regard for their reputation for truthfulness.

Another witness testified that Theresa and Harry had a fine reputation as a result of several business transactions she had with them in the real estate field. She also testified that she knew that Theresa had used her maiden name in the course of Theresa's activities in the real estate market when she was married to Harry, and that such conduct did not affect her reputation for honesty.

A friend of Theresa's whom she had known in Peru testified that he and those who knew her in Peru had the highest regard for her and that she had an excellent reputation for truthfulness.

Finally a witness who had been engaged in the jewelry business testified he has known Theresa for many years as well as people with whom she had contact with in the business world, that she has a reputation for being an honest woman who always tells the truth, and that she has an excellent reputation for integrity and trustworthiness.

Credibility is a matter to be determined by the trier of the facts. *People v. Malizia*, 62 N.Y.2d 755, 476 N.Y.S.2d 825, 465 N.E.2d 364 (1984). Based upon an assessment of the evidence and the record, and viewing the same in a light most favorable to the trustee, this court is led to the inexorable conclusion that the trustee has failed to prove that the defendants lack credibility, integrity or trustworthiness. These findings of the court are not based on gut feelings and hunches but on the evidence and the record. Both fail to support the trustee's contention that the defendants were not creditable.

## CONCLUSION

The trustee has failed to prove directly or by circumstantial evidence that the transfer to the Hermans of the contract of purchase of the Sawyer Avenue premises constituted a fraudulent conveyance under the laws of the State of New York.

The trustee has further failed to prove directly or by circumstantial evidence any acts committed by the debtor or his wife, or the Hermans, which justify a finding that the subject property be impressed with an equitable lien in favor of the trustee in any amount.

This opinion is adopted as the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and FRCP 52.