**In re Sanford BERMAN, Debtor.**

**G & G CARDS & GIFTS, INC., Brian Green and Jeffrey Green, Plaintiffs,**

v.

**Sanford BERMAN, Defendant.**

**Bankruptcy No. 187–70602–352. Adv. No. 187–0126.**

United States Bankruptcy Court, E.D. New York.

May 23, 1989.

As Amended June 6, 1989.

Neil Flaum, Great Neck, N.Y., for debtor-defendant.

Lee, File & Amtzis, Staten Island, N.Y., by Howard M. File (John G. Gatti, of counsel), for plaintiffs.

## DECISION

MARVIN A. HOLLAND, Bankruptcy Judge:

Plaintiffs' (collectively the "Greens" or "plaintiffs") second amended complaint [for prior history of debtor's case leading to the amendment of previous pleadings, see *In re Berman*, 100 B.R. 658 (Bankr.E. D.N.Y.1989)] requests a declaration of non-dischargeability of its claim pursuant to § 523(c)(a)(6) [sic] [presumably § 523(a)(6)], for willful and malicious injury by the debtor ("debtor" or "Berman" or "defendant") to the property of another and seeks to deny the debtor a discharge under the following sub-sections of § 727: (a)(2) for transferring, removing, destroying, mutilating or concealing property of the debtor, or permitting same, within one year before the date of the filing of the petition; (a)(3) for failure to keep books and records from which the debtor's financial condition might be ascertained; (a)(4) for knowingly and fraudulently making a false oath; (a)(5) for failure to satisfactorily explain the loss or deficiency of assets; and (a)(7) for the commission of certain acts specified under (a)(2), (3), (4), (5) or (6) of this section in conjunction with another case under this title or under the Bankruptcy Act, concerning an insider.

The conflict between the parties arose out of the sale of a card and gift business ("Season's Greetings" or "business" or "store") originally owned by the corporate plaintiff to 3259 Richmond Ave Corp., a corporation wholly owned by the debtor. The individual plaintiffs are the owners and principals of the corporate plaintiff.

The joint pre-trial submission of the parties generally indicates the following is undisputed:

1. Plaintiffs hold an undersecured and/or unsecured claim against the debtor in the unpaid sum of $394,776.00 arising out of their sale to the debtor of a cards and gift store as evidenced by a promissory note, financing security agreement and financing statement executed on August 16, 1985.

2. That said promissory note was originally secured under a security agreement dated August 16, 1985 and by a UCC-1 financing statement which provided that all the inventory, fixtures, equipment and leasehold rights contained in the business and store premises known as Season's

Greetings located at 3259 Richmond Avenue, Staten Island, New York, would serve as collateral for the aforementioned promissory note.

3. That during the year immediately preceding debtor's filing of his Chapter 7 petition, more particularly in February and March, 1987, he made substantial preferential payments to Trust Company of New Jersey totalling $47,825.06.

4. That on December 31, 1986, the debtor, without the plaintiffs' knowledge and/or consent, abandoned and vacated the business.

The plaintiffs maintain and the debtor disputes the following:

5. That in order to regain possession of the store premises, plaintiffs were compelled to pay debtor's landlord rental arrears totalling $10,000.00, which sum they duly paid in or about January 1987.

6. That on or about January 15, 1987, plaintiffs gained access into debtor's store premises and discovered that most, if not all, of the stock in trade and inventory of the business had been removed by defendant.

7. That upon gaining access, plaintiffs discovered that certain trade fixtures and equipment had been removed from the store premises by the defendant and that what was remaining had a value of less than $1,100.00.

8. That the value of the removed fixtures and equipment was in excess of $25,000.00.

9. That plaintiffs commenced a summary proceeding against defendant in Civil Court, Richmond County (Index No. 50055/87) which resulted in a final judgment of possession and the issuance of a warrant of eviction.

In support of their § 727(a)(3) objection, plaintiffs allege that the debtor has failed to keep or preserve all of the books of account or records relating to Season's Greetings and of the debtor individually from which the overall financial condition of both the business and that of the debtor might be ascertained, for the period August 18, 1985 through March 7, 1987, and further, that Berman has failed to maintain accurate accounting records stemming from the bulk sale of what was essentially all of Season's Greetings' assets.

In support of their § 727(a)(5) objection, the plaintiffs allege the debtor's failure to adequately explain any and all losses of business assets particularly trade fixtures, inventory and equipment or the reason(s) for abandoning the business and its premises in December, 1986. The plaintiffs point to the debtor's placement of a sales advertisement on November 6, 1986 in the Multiple Listing magazine of Staten Island wherein he listed the business as a "gold mine." Also, the plaintiffs allege Berman's failure to satisfactorily explain the reason for discounting certain promissory notes due him on the sale of his Aamco Transmission business for $16,000.00 when its face value was $27,000.00 and, additionally, the necessity of withdrawing approximately $32,000.00 from his individual IRA, all within three months prior to the filing of his Chapter 7 petition. Lastly, Green alleges Berman's failure to satisfactorily explain the whereabouts of certain assets, or the proceeds thereof, from the bulk sale of the business.

In support of their § 727(a)(4)(B) objection, the plaintiffs allege Berman's intentional omission and concealment of certain assets from his statement of assets and liabilities, as well as the omission of certain names, addresses and amounts owing to creditors of the business, solely for the purpose of hindering, delaying and defrauding creditors. He points to, *inter alia*, certain security deposits of Season's Greetings held in trust by the gas and electric company, certain unexplained withdrawals from various banking institutions within the three months preceding his filing, and of more import and concern, "the source of cash debtor has and continues to utilize during his frequent gambling sojourns to Atlantic City, particularly during the period January 1987 through March 1987." (Second Amended Verified Complaint at 10).

In support of their § 523(a)(6) objection, the plaintiffs allege that immediately pre-

ceding Berman's filing of the petition herein, he knowingly, willfully and intentionally caused malicious injury to property belonging to the plaintiffs by causing same to be either removed, transferred, destroyed, concealed or sold, in addition to causing to be mutilated and rendered useless, other trade fixtures and equipment remaining on the business premises.

In support of their § 727(a)(4)(A) objection, the plaintiffs allege that at the first meeting of creditors, on or about May 8, 1987, Berman knowingly and fraudulently —(1) gave false testimony regarding all of his schedules; and (2) failed to explain the whereabouts and existence of certain assets and liabilities including certain life insurance policies and gambling debts for the period January 1, 1987 through March 1, 1987, with the deliberate intent to hinder, delay and defraud the plaintiffs.

And finally, in support of their § 727(a)(2) objection, the plaintiffs point to certain transfers of monies, totalling approximately $47,825.00, to the Trust Company of New Jersey ("Trust" or "Union Trust"), in February and March, 1987, solely with the deliberate intent to hinder, delay and defraud the plaintiffs. They also point to other transfers to creditors, names and amounts unknown, during the year immediately preceding debtor's filing, solely to hinder, delay and defraud the plaintiffs in the collection of their claim.

Rather than seeking to dismiss under Federal Rule 12(b)(6), Berman, by amended answer dated March 28, 1988, avers that the complaint fails to set forth a claim upon which relief can be granted. He admits, however, certain allegations contained in paragraph 20(1) of the complaint to the extent of certain transfers being made to Bernard Block and/or his corporation as an accommodation and to Ann DeBernardo on the same basis and that as repayment for an owing debt, Mac Distributing took a cash register from the store.

Regarding the omission of certain creditors and assets from the debtor's sched-

ules, Berman alleges that they, as well as those assets allegedly transferred, removed, destroyed or concealed by him, were not assets of the debtor, but rather his solely-owned corporation and for this reason need not be scheduled on his individual petition.

### DISCUSSION

#### I.

Pursuant to Federal Rule 12(b)(6), a complaint must be dismissed if it fails to state a claim upon which relief can be granted. The bare minimum is required provided it sets forth the basis upon which relief is sought, *Dioguardi v. Durning*, 139 F.2d 774, 775 (2d Cir.1944), and should not be dismissed "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). All of the well-pleaded material facts alleged in the complaint must be admitted for purposes of this dismissal motion. *First National Bank of Boston v. Daniel H. Overmyer (In re Overmyer)*, 32 B.R. 597, 602 (Bankr.S.D.N.Y. 1983). The court has reviewed each of the claims for relief under Federal Rules 9(b) and 12(b)(6) and Fed.R.Bankr.P. 7009 and 7012(b) and finds as follows:

Paragraphs 1–19, 20(a)(b)(c)(d)(e)(f)(g)(h) (i)(j), 22, 23 and 24 set forth sufficient facts to satisfy the pleading requirements under Federal Rule 8(a)(2) and therefore survive dismissal. Paragraph 21, although styled as setting forth an objection to discharge pursuant to § 727(a)(4)(B), sets forth an objection to discharge pursuant to § 727(a)(2) and shall be deemed so made under that sub-section.

■ Paragraph 20(k)(1), however, is deficiently pleaded for its failure to state that the alleged transfers were made "with intent to hinder, delay or defraud a creditor or officer of the estate ..." 11 U.S.C. § 727(a)(2).[1] As other claims have been

---

1. Paragraph 20(k)(1) provides in full—
   [t]hat between the period of September 1986 and March 1987, the debtor transferred,

removed, destroyed, or concealed or permitted to be removed, destroyed, sold or concealed various trade fixtures located at store

properly pleaded under § 727(a)(2), and in accordance with the liberality of amendments under Federal Rule 15,[2] we will deem the motion to amend to be so made, granted, and we shall proceed in that fashion. Accordingly, claim 20(k)(1) shall not be dismissed.

Paragraph 20(k), although inartfully pleaded, will also survive under the liberal standards referred to above. It states, in part, that the debtor "has failed to list the names, addresses and amounts due and owing all of his creditors in violation of 11 U.S.C. § 727(a)(4)(B) in that, upon information and belief, debtor failed to list various personal and corporate creditors pertaining to the cards and gifts business in which the debtor was the sole shareholder, including, but not limited to...." The schedules are sworn to. It is alleged that they are false. Therefore, under the *Dioguardi* test, *supra*, as it does not appear beyond a doubt that the plaintiffs could prove no sets of facts in support of their claim which entitle them to relief, the allegation will survive dismissal.

We now turn to whether the plaintiffs have made out their *prima facie* case to deny Berman his discharge and/or deny the dischargeability of their debt.

## II

■ The granting to a debtor of a "fresh start" is the quintessence of the bankruptcy code and the litmus against which any argument impacting discharge must be compared in determining compliance with congressional intent. *In re Hughes*, 95 B.R. 20 (Bankr.E.D.N.Y.1989); *see also, Local Loan Co. v. Hunt*, 292 U.S. 234, 244,

54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). This "fresh start" afforded by the discharge is available "only to the honest bankrupt who surrenders all that he possesses to his creditor and not to one who by a process of legal necromancy is living in luxury upon an estate which *equitably* belongs to them." *In re Quackenbush*, 102 F. 282, 285 (N.D.N.Y.1900) (emphasis added); *see also, In re Becker*, 106 F. 54, 56 (N.D.N.Y.1901), *aff'd*, 112 F. 1020 (2d Cir. 1901); *Sacklow v. Vecchione (In re Vecchione)*, 407 F.Supp. 609, 619 (E.D.N.Y. 1976). The onus is placed upon the court to make certain "that a bankrupt does not by short turns and ingenious devices arrange with his relatives to defraud his creditors...." *Stanley's Incorporated Store No. 3 v. Neiderheiser (In re Neiderheiser)*, 45 F.2d 489, 492 (8th Cir.1930).

■ For an objection to the debtor's discharge to be sustained, grounds sufficient under one of the sections of 11 U.S.C. § 727 must be outlined and covered, *In re Little*, 65 F.2d 777, 778 (2d Cir.1933) (Hand, J.A.), *rev'g* 2 F.Supp. 264 (E.D.N.Y.); *In re Feinsilver*, 24 F.2d 408, 409 (2d Cir.1928), as a debtor shall not be denied a discharge on general equitable grounds. It will be denied only if the specific burden imposed under one of the statutory grounds for objection is fulfilled. *Shelby v. Texas Improvement Loan*, 280 F.2d 349, 355 (5th Cir.1960).

Pursuant to Bankruptcy Code § 727, the burden of proof is clearly placed upon the objector. Bankruptcy Rule 4005. The 1983 Advisory Committee to Rule 4005 explains that a § 727 objector has the ulti-

---

premises 3259 Richmond Avenue, including cash registers, shelvings, refrigerators, calculators, standing card fixtures, partitions, lighting and card racks, as well as diverse inventory items, including, but not limited to, associated greeting cards, specialty gifts, paper goods and stationery goods, which said inventory and fixtures were sold or transferred to Bernard Block c/o Country Village Cards & Gifts, Inc., Something Special Cards & Gifts, Inc., and Village Variety of New York Inc. at Pergament Shopping Center, Staten Island, New York, and Ann DeBernardo c/o Egers Lutheran Nursing Home, 120 Meiser Avenue, Staten Island, New York, cigarette inventory

to South Beach Novelties & Confectionery Co. Inc., 44 Robin Road, Staten Island, New York, and other trade fixtures contained on Exhibit "D" annexed hereto and made a part hereof.

2. Federal Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." Leave to amend is appropriate "where the moving party has not been guilty of bad faith and is not acting for the purposes of delay, the opposing party will not be unduly prejudiced, and the trial on issues will not be unduly delayed." 3 Moore's Federal Practice § 15.08 [2d ed. 1983].

mate burden of persuasion. The evidentiary degree, however, upon which an objector must go forward to sustain its burden of proof, and when such burden of going forward may properly shift to the bankrupt, was seemingly left unexplained by Rule 4005:

This rule does not address the burden of going forward with the evidence. Subject to the allocation by the rule of the initial burden of producing evidence and the ultimate burden of persuasion, the rule leaves to the courts the burden of going forward with the evidence in the light of considerations such as the difficulty of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the debtor than the objector....

Rules of Practice and Procedure in Bankruptcy Practice and Procedure in Bankruptcy Rule 4005's Advisory Committee Note; *see also, Chittenden Trust Company v. Mayo (In re Mayo),* 94 B.R. 315, 323 (Bankr.D.Vt.1988).

■ Consistent with the presumption that all debts are dischargeable in bankruptcy unless specifically excepted by the Code, that the provisions of § 727 are to be construed liberally in favor of the honest debtor, *Brown v. Felson,* 442 U.S. 127, 128, 99 S.Ct. 2205, 2207, 60 L.Ed.2d 767 (1969) (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)); *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *In re Kokoszka,* 479 F.2d 990, 997 (2d Cir.1973), *aff'd sub nom., Kokoszka v. Belford,* 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374, *reh'g denied,* 419 U.S. 886, 95 S.Ct. 160, 42 L.Ed.2d 131 (1974); *Household Finance Corp. v. Danns (In re Danns),* 558 F.2d 114, 116 (2d Cir.1977); *Bank of Pennsylvania v. Adlman (In re Adlman),* 541 F.2d 999, 1004 (2d Cir.1976); *In re Mayo,* 94 B.R. 315 at 333; *Baer v. Greene (In re Greene),* 81 B.R. 829, 833 (Bankr.S.D.N.Y.1988); *Chaudry v. Usoskin (In re Usoskin),* 56 B.R. 805, 813 (Bankr.S.D.N.Y.1985), and in keeping with the delicate balance between the fresh start policy and that of preventing a dis-

honest debtor from avoiding the consequences of wrongful conduct, we conclude that the objector may sustain its burden only upon a showing by clear and convincing evidence. *In re Mayo, supra,* (court goes through the history of objections to discharge and concludes that under the present Code § 727 and Bankruptcy Rule 4005 the burden is on the plaintiff objecting to discharge, which must be proven by clear and convincing evidence); *accord, Camacho v. Martin (In re Martin),* 88 B.R. 319 (D.Colo.1988); *Bologna v. Cutignola (In re Cutignola),* 87 B.R. 702 (Bankr.M.D. Fla.1988); *B.K. Medical Systems, Inc. Pension Plan v. Roberts (In re Roberts),* 81 B.R. 354 (Bankr.W.D.Pa.1987).

In this adversary proceeding the Greens seek to deny Berman's discharge by attempting to establish that Berman, *inter alia,* intentionally defrauded creditors by withdrawing funds from his individual accounts to be used to pay down a second mortgage on his wife's home ("Elaine" or "wife"); that he has failed to adequately maintain books and records of both his financial affairs and that of Season's Greetings; that he has failed to satisfactorily explain the loss and dissipation of his individual assets and that of Season's Greetings; that he has intentionally omitted and concealed assets and creditors from his schedules with the actual intent to hinder, delay and defraud his creditors; that he has knowingly, willfully and intentionally caused malicious injury to property belonging to the defendant; and finally, that at the first meeting of creditors, Berman knowingly and fraudulently gave false testimony regarding his schedules and the whereabouts of certain assets, all with the intent to hinder, delay and defraud his creditors. For all this, the plaintiffs request that we deny Berman his discharge pursuant to Code §§ 727(a)(2), (3), (4), (5) and (7) and find their debt non-dischargeable pursuant to Code § 523(a)(6). We will address each issue *seriatum.*

### III.

■ Section 727(a)(2), derived from § 14(c)(4) of the Act, prohibits the granting

of a discharge to a debtor who "with intent to hinder, delay or defraud a creditor has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed or concealed—property of the debtor within one year before the date of the filing of the petition." Clear and convincing evidence is required of the trustee, who has the burden of establishing actual fraud. *ACLI Government Securities, Inc. v. Rhoades,* 653 F.Supp. 1388 (S.D.N.Y.1987), *aff'd,* 842 F.2d 1287 (2d Cir.1988); *see generally, Halpern v. Schwartz,* 426 F.2d 102, 104 (2d Cir.1970) (to bar a discharge under § 14(c)(4), 11 U.S.C. § 32(c)(4), actual intent to hinder, delay or defraud must be proven). In order to sustain a § 727 objection, the proof must show—

> (1) that the act complained of was done at a time subsequent to one year before the date of the filing of the petition;
>
> (2) with actual intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code;
>
> (3) that the act was that of the debtor or his duly authorized agent; and
>
> (4) that the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done.

4 *Collier on Bankruptcy,* § 727.02 at 727–10 (15th ed.1988). In determining whether the debtor acted with the requisite actual intent to hinder, delay or defraud, the court may draw inferences from the circumstances surrounding the allegedly fraudulent act, *McCormick v. Security State Bank,* 822 F.2d 806, 808 (8th Cir.1987); *Gray v. Fill (In re Fill),* 82 B.R. 200, 202 (Bankr.S.D.N.Y.1987); *see also, DeWest Realty Corp. v. Internal Revenue Service,* 418 F.Supp. 1274, 1279 (S.D.N.Y.1976), and may look to certain court-adopted "badges of fraud" as further evidence of this requisite intent. *In re Freudmann,* 362 F.Supp. 429, 433 (S.D.N.Y.1973), *aff'd per curiam,* 495 F.2d 816 (2d Cir.), *cert. denied, Freudmann v. Blankstein,* 419 U.S. 841, 95 S.Ct. 72, 42 L.Ed.2d 69 (1974); *In re Saphire,* 139 F.2d 34, 35 (2d Cir.1943).

Court-adopted badges of fraud include, but are not limited to, transfers possessing one or more of the following attributes:

(1) lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question, although title exists in another entity;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) conveyance of all of the debtor's property;

(6) secrecy of the conveyance;

(7) existence of a trust or trust relationship between the debtor and the person to whom the property was conveyed;

(8) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring debt, onset of financial difficulties, or pendency or threat of suit by creditors;

(9) the instrument affecting the transfer suspiciously states that it is in fact bona fide;

(10) the debtor makes a voluntary gift to a family member; and

(11) the general chronology of events and transactions under inquiry.

*See generally, Salomon v. Kaiser (In re Kaiser),* 722 F.2d 1574, 1583 (2d Cir.1983); *Rhoades,* 653 F.Supp. at 1394; *Atlanta Shipping Corp., Inc. v. Chemical Bank,* 631 F.Supp. 335, 347 (S.D.N.Y.1986), *aff'd,* 818 F.2d 240 (2d Cir.1987); *Musso v. Herman (In re Tesmetges),* 85 B.R. 683, 698 (Bankr.E.D.N.Y.1988) (Duberstein, Ch. J.); *Fill,* 82 B.R. at 220; *National City Bank, Marion v. McNamara (In re McNamara),* 89 B.R. 648, 651 (Bankr.N.D.Ohio 1988); *Eisenberg v. Casale (In re Casale),* 62 B.R. 889, 898 (Bankr.E.D.N.Y.1986), *aff'd,* 72 B.R. 222 (E.D.N.Y.1987).

In their complaint, the Greens allege that Berman transferred, removed, destroyed, mutilated, concealed the following assets,

with the "actual intent to hinder, delay or defraud creditors":

1) all of the stock in trade of Season's Greetings;

2) proceeds received from Martin Brownstein stemming from the sale of certain promissory notes;

3) rental proceeds received on both his primary residence and a condominium in Florida;

4) $32,445 from his Dean Witter Realty, Ltd. partnership IRA;

5) proceeds of roughly $9,000 received upon the liquidation of certain inventory of Season's Greetings;

6) other income received from the liquidation or sale of inventory and trade fixtures of Season's Greetings in late 1986;

7) contents of his safe deposit box;

8) cash received from Bernard Block prior to the closing of Season's Greetings;

9) cash payments received from Vincent Russo on January 4, 1987;

10) drawdown proceeds against his four (4) whole life insurance policies; and

11) a check received by and made payable to Elaine on sales of certain Season's Greetings' inventory to Ann DeBernardo of Eger Nursing Home.

(Second Amended Verified Complaint objecting to discharge at 7–9, February 4, 1988; Post–Trial Memorandum of Plaintiff at 10–13 (undated)).

Both parties seem to agree that the only two elements at issue are (1) whether all such transfers were made with the actual intent to hinder, delay or defraud creditors, and (2) whether certain transfers, particularly those pertaining to the stock in trade of Season's Greetings, and proceeds thereof, were transfers of the debtor's property. (Amended Answer, paragraph 22). It is undisputed that the other items allegedly transferred were that of the debtor. If we find that the transfer of those assets uncontrovertedly owed by the debtor was performed "with actual intent to hinder, delay or defraud creditors" the need to ascertain whether the stock in trade and their pro-ceeds were property of the debtor is obviated.

### IV.

The complexity and difficulty of determining actual intent is compounded by the fact that one rarely identifies its intent. As Judge Edward Neaher pointed out in a situation strikingly similar to the facts of our case:

Persons whose intention it is to shield their assets from creditor attack while contriving to derive the equitable benefit of those assets rarely announce their purpose. *Instead, if their intention is to be known, it must be gleaned from inferences drawn from a course of conduct,*

*In re Vecchione,* 407 F.Supp. 609 at 615, *citing to, In re Saphire,* 139 F.2d 34 at 35 (emphasis added), taking into account the timing of the events or transfers in question, *EFA Acceptance Corp. v. Cadarette (In re Cadarette),* 601 F.2d 648, 651 (2d Cir.1979), and the ultimate purpose of such conduct. *In re Freudmann,* 495 F.2d 816 at 817.

As will be shown below, Berman's carefully concocted plan, providing for the transfer of essentially all his assets to family members, were made under suspect circumstances within three months prior to filing while leaving his creditors totally at bay.

Beginning in early May 1985 discussion commenced between Berman and Green whereby Berman, through his solely-owned corporate vehicle, 3259 Richmond Avenue Corp. would purchase Season's Greetings. These discussions climaxed with the parties entering into a contract, dated May 22, 1985, for Berman to purchase Season's Greetings for $413,000.00 (T., 8/25/88 at 48). On July 16, 1985 the closing took place with Berman executing a promissory note in favor of G & G Cards & Gifts, Inc., the seller's solely-owned corporation, for $373,000.00. This note was collateralized by virtually all the stock in trade of Season's Greetings. Evidencing this secured transaction was a properly signed security agreement dated July 16, 1985 (Exhibit C)

and properly filed financing statements. (Exhibit D). To help finance the down payment, and attendant closing costs, as well as necessary start-up costs, Berman, on June 20, 1985, caused Elaine to give Trust a second mortgage on her personal residence, located at 156 Nome Avenue, Staten Island, New York in exchange for a $85,000.00 loan. Berman, Elaine and one of their two children reside at this residence. Evidencing this loan is a promissory note for $85,000.00 with Trust as obliger, Berman as obligee.

Following the sale of Season's Greetings, Berman took possession of the stock and continued to make payments proscribed under the note, albeit untimely. These payments were continually made up until sometime in October or November, 1986. Prior thereto, sometime around June or July, 1986, continuing through September or October, 1986, Berman met with the Greens to assess his present financial situation. The substance of their conversation was that he was having severe financial difficulties, could no longer make payment on the note, and requested a "little breathing room." (T., 8/25/88 at 117). Berman alleges that both Greens, Jeff and Brian, were totally unsympathetic to his cause, were callously indifferent and indicated that no reprieve would be granted. (T., 8/25/88 at 118). Thereafter, but sometime prior to the closing of Season's Greetings on December 31, 1986, Berman again approached Brian individually, again indicating his financial distress, only to have Brian "laugh in his face." (T., 8/25/88 at 118).

It is at this point that Berman undertook a course to sell almost all of the stock in trade of Season's Greetings. The testimony of the parties, as well as the documentary evidence, paints the following picture: prior to speaking with the Greens concerning his financial problems, Berman decided, around July, 1986, to conduct an unpublicized going out of business sale. From around July, 1986 to the last day of business Berman put signs in the window of Season's Greetings stating "Sale, Special Sale, Clearance Sale", indicating that the store was holding some kind of unusual

sale outside the ordinary course of business, (T., 9/22/87 at 51), and, at approximately the same time listed the business with various brokers. He testified that he did not recall who the listing brokers were, their names, when the listing contract took place, or whether the bid price was over $400,000. Apparently what happened was that two brokers came into Season's Greetings and asked Berman if he was interested in selling the store, to which he responded "yes." (T., 8/25/88 at 102). An exclusive to sell was given to Heritage Agencies on October 28, 1986, with the broker to receive a six "(6) percent commission in the event the property or any portion thereof is sold or exchanged during the term of this contract." (Exhibit X, Listing Agreement, in evidence); (T., 8/25/88 at 108). The listing agreement called for a selling price of $750,000 and also called for the seller "to advertise minuim [sic] of twice a week on weekends in S.I. Advance a *must.*" *Id.* (emphasis in original).

The advertisement listing Season's Greetings for $750,000 also lists the condition of the store as excellent, and its sales outlook as a "gold mine." (Exhibit X). Apparently, when no party made a serious offer at the current offering price (T., 8/25/88 at 110), the parties entered into a "report of change of listing contract", dated November 8, 1986, decreasing the asking price from $750,000 to $625,000. All other conditions of the October 28, 1986 contract remained the same. (Exhibit Y in evidence). The advertisement again indicated "store is gold mine" and that the "[b]usiness grosses $850,000 a year [and] works on 40% markup!" *Id.* As before, Berman was unsuccessful in procuring a buyer at this price. After this attempt proved futile, no further efforts were made to sell the store, no further contacts with the broker were had, and no reduction in the purchase price was given. (T., 8/25/88 at 111). Instead, Berman set out to sell the contents of the store piecemeal, out of the ordinary course of business, and then permanently closed up shop.

Although the specific date is unknown, the first of such sales was to Mr. Bernard

Block of Country Village, apparently another stationery goods retailer. When questioned about whether the sales proceeds were deposited into the corporate account, Berman responded "[i] don't recall." (T., 9/22/87 at 61). There was also the sale to Russo of Peddler's World. When questioned about whether he sold *any* fixtures or equipment outside the ordinary course of business, or whether he transferred, conveyed, or sold a cash register to Peddler's World, he responded "[n]o." (T., 9/22/87 at 61). Russo's subpoenaed testimony, however, proves otherwise.

He testified that in early January, 1987, Berman inquired into his interest in purchasing certain merchandise and fixtures. As a result of this conversation, a deal was consummated. Russo testified that he had purchased "stationery items, school supplies, a *cash register*, greeting cards; it totalled about $1,600." (T., 8/25/88 at 40). He further testified that payment was made by check, payable to Sanford Berman individually. (*See* Exhibit Z in evidence, check dated 1/2/87 from Mac Distributors, Inc., payable to Sanford Berman for $1600.00, signed by Vincent Russo). Berman did not controvert that this check was for goods sold by Season's Greetings, out of the ordinary course of its business and made payable to him individually (T., 8/25/88 at 42). He also did not controvert that this $1600 check was not for monies previously owed to Season's Greetings or Sanford Berman. In fact, this was the first time Russo had any business dealings with Season's Greetings or Berman whatsoever. (T., 8/25/88 at 43). Although Berman did not refute the sale itself, he did somewhat refute where the proceeds ultimately landed up—"I would have to imagine that it was deposited into the corporation account." (T., 8/25/88 at 115).

There was also Berman's return of Season's Greetings' cigarette inventory to its distributor. He testified that South Beach Confectionary was its cigarette supplier, (T., 8/25/88 at 79), and that sometime *after* December 31, 1986 he returned to them whatever cigarette inventory he had on hand. This return took place sometime in the first week of January. In exchange for the returned inventory, Berman received a check for $6348.08, dated and time stamped January 2, 1987 (T., 8/25/88 at 81) and made payable to Season's Greetings. Berman testified that this check was deposited into the corporate account. Indeed, Check 8135 of South Beach, annexed to Exhibit F in evidence, corresponds to and indicates such payment as noted above being deposited in the corporate checking account. (Corporate checking account Exhibit L in evidence, statement dated January 30, 1987).

Coincidentally enough, both the sales to Block and Russo and the inventory return to South Beach took place around January 2, 1987, just two days after the permanent closing of Season's Greetings and on the first day of business in 1987. (We are assuming for the purposes of argument that most, if not all, businesses were closed on New Year's day). What is not so coincidental, however, is the fact that although Berman "imagined" (T., 8/25/88 at 115) that Russo's check for $1600.00 was deposited into the corporate account, this is not what happened.

Berman testified that Season's Greetings' banking institution was Gateway Savings Bank, that it used no other banks to do its banking, and that it had but one business account, a checking account. (T., 9/22/87 at 45–47). A close look at Season's Greetings' January 30, 1987 and February 27, 1987 bank statements reveals no such deposit. (Exhibits L and M in evidence). Neither one of these statements reveals any check for $1600.00 being deposited into this account for either of those months, although the $1600.00 check was received by Berman and dated January 2, 1987. The record also does not reflect that either the Greens knew, received notice of, or consented to these sales or return, or any such payment thereon, being made in Berman's individual name. To date, Berman has failed to explain the whereabouts of this check. What is also not so coincidental is the series of banking transactions that took place sometime after December 31, 1986, which tracks the proceeds of the re-

turned cigarette inventory being paid out to the debtor.

The January 30, 1987 statement indicates that as of January 1, 1987 Season's Greetings' checking account had an opening balance of $1422.30. On January 2, 1987 three checks were deposited into this account, two checks for $346.05 and $879.57 respectively, and a third for $6348.08, which represents the proceeds received from the return of the cigarette inventory. This left the total balance at approximately $8,996.00. On even date, Berman caused Season's Greetings to draw a check to him for $6,900.00 (Exhibit I in evidence) representing "accrued wages" (T., 8/25/88 at 101) leaving an account balance of $2096.00. And on that very same day, Berman again caused Season's Greetings to draw a check payable to him for $1,600.00, again for "accrued wages", leaving it with a monthly ending balance of $1681.70, taking into account bank charges of $31.44 and a January 22, 1987 deposit of $1217.14.

When questioned about these "accrued wages" owed both him and his wife (T., 8/25/88 at 101), Berman testified as follows:

Q. For the period that your [sic] operated the store was your wife employed by the corporation.

A. Yes.

Q. And was your wife paid a salary through ⸱corporation.

A. At the latter part of the beginning of the business, yes.

Q. Do you know what the salary was when she began receiving it.

A. I think $125 a week.

Q. And did your wife devote full time duties to the business or part time.

A. Full time.

Q. Was that from the beginning of the operation to the end of the operation.

A. Yes.

Q. Did there come a time that your wife stopped receiving a weekly salary check.

A. Yes.

Q. When was that.

A. December of '86.

Q. Did you derive any wages from the corporation.

A. At the same time my wife did.

Q. So you and your wife started taking salaries at the same time.

A. Yes.

Q. What salary did you take.

A. $125 a week.

Q. And did this stop in December of 1986.

A. Yes.

Q. Up until this period of time when you and your wife went on payroll, did you take any salary out of the corporation.

A. No.

(T., 9/22/87 at 37–39).

Mr. Berman testified that he and his wife did not draw a salary for the period of approximately July, 1985 through July, 1986. (T., 9/22/87 at 37). It was only around July, 1986 when Berman and his wife began drawing salary against Season's Greetings. Ironically enough, Berman caused Season's Greetings to commence paying back accrued wages at precisely the same time that Season's Greetings began incurring serious financial difficulties. In fact, Berman testified that it was at this point he contacted the Greens to inform them that he could no longer make the payments called for on each note. He testified that he—

explained to the [b]rothers that it was virtually impossible ... to continue paying the notes, such as; I asked them to please give me a list of——a little help on the notes, let me cut the notes down, let me split it in half so that I can stay operating, I can't meet it. (T., 8/25/88 at 117).

Instead of leaving the monies in the corporate account to be used as desperately needed working capital, Berman decided to withdraw all but a portion of it. It is also interesting that although he previously testified that Season's Greetings owed back

salary to both him and Elaine, none of the checks were made payable to Elaine.

And, as if the sales above were not enough, Berman caused one more sale to transpire, this time with Ann DeBernardo of Egers Nursing Home. This sale, however, was the most blatant of them all. When questioned about this sale, he testified that not only did such a sale to DeBernardo not take place, but in fact, "neither him nor anyone on his behalf did or sold anything to [her]." (T., 8/25/88 at 120). Her subpoenaed testimony, like that of Russo's, paints a different picture.

She testified that she served as a volunteer director at the gift shop owned by the Egers Nursing Home. (T., 10/13/88 at 4). Sometime in December of 1986, roughly between Christmas and New Year's, she went to Season's Greetings after speaking with Elaine and purchased some goods, making payment for these goods with a business check.

The curious thing though was that the check was not payable to Season's Greetings or Sanford Berman. It was made payable to Elaine Berman. When questioned why she made the check payable to Elaine Berman, DeBernardo responded—"I just took it for granted it was just to be written out to her." (T., 10/13/88 at 8). The record does not reflect that this check was returned to DeBernardo or not otherwise cashed by Elaine. In any event, there is no indication that the proceeds were either deposited into the corporate account or transfered to Berman to be used for corporate purposes.

The unauthorized sales to Russo and De-Bernardo constitute grounds to find Greens' debt non-dischargeable under 11 U.S.C. § 523(a)(6). Since the proceeds of those inventory sales were neither used for corporate purposes, nor remitted to the Greens, the transaction, in and of itself, constitutes a conversion, and therefore, falls within the purview of 11 U.S.C. § 523(a)(6). *See e.g., Standard Bank & Trust Company v. Iaquinta (In re Iaquinta)*, 95 B.R. 576, 578 (Bankr.N.D.Ill.1989) (wherein the court found the bank's debt non-dischargeable under § 523(a)(6) for the debtor's willful failure to remit proceeds of sale of inventory in which the bank had a security interest, said sale being conducted without the bank's consent, knowledge or authority). We, however, express no opinion on the plaintiffs' rights under § 523(a)(6) as we find Berman's willful, wanton and callous acts more appropriately disposed of under § 727.

Further manifestations of Berman's intent to defraud can be gleaned from the series of events that took place prior to the sales and return discussed above, but sometime after the payments on the note had ceased. Green testified that payments had been made on the notes to sometime around October or November, 1986. Sometime in early January 1987, on or around January 2, Green received a phone call from a neighbor informing him that the "store no longer existed." (T., 8/25/88 at 56). Based upon this phone call, Green (Brian) went down to the store only to find it completely inaccessible, as it was locked from both sides. By peering through the window he noticed that both the lights and electric had been shut off. When questioned about whether others had keys to the store Green indicated that besides Berman *only* he and his brother had access and that the managing agent or its representative were not provided with a key. (T., 8/25/88 at 57). In an attempt to gain entry into the store, Green contacted either the landlord or its agent, and after paying approximately $8,000–$10,000 back arrears to them (see Exhibit U, shopping center lease in evidence indicating monthly rental to be $2,666.67/month), access would then be gained.

On January 14, 1987 Green again went back to Season's Greetings, this time with both the managing agent and a locksmith meeting him there. The locksmith picked the lock to gain access. Upon entry, Green alleges that he went to the back door to see if it was secured, finding it properly secured from the inside. He also testified that the place was totally devoid of merchandise, that there were vulgarities strewn all over the shelving of the walls (T., 8/25/88 at 60) and that all the missing

furniture was in excellent condition when he sold the store to Berman in July, 1985. All of this testimony was uncontested and uncontroverted by the defendant, and completely supported and substantiated by Mr. Edward J. Maloy, a sales representative from Bartels and Elleford, the managing agent for the shopping center where Season's Greetings was located.

Mr. Maloy testified that upon entering Season's Greetings on January 14, 1987, he noticed "very little of anything ... practically no inventory" and that the rear door was secured. (T., 8/25/88 at 93). Mr. Maloy further testified that there was no question in his mind that the store had not been vandalized or burglarized. *Id.*

After attempting to salvage the remains, Green attempted to re-start Season's Greetings only to be confronted with further complications. Various utilities now requested deposits, and suppliers were hesitant to do business with either him or Season's Greetings. The most problematic supplier was Hallmark who refused to do business with him until an outstanding debt was brought current. (T., 8/25/88 at 65). Green testified that absent Hallmark's continuation as its supplier existence as a viable entity was virtually impossible. After further inquiry, Green learned that the debt belonged to Berman and his corporation. Apparently after paying this outstanding debt sometime in May of 1987, Hallmark resumed business with Green. When questioned by his counsel regarding this and other transactions in which he ordered merchandise under the trade name G & G Cards & Gifts, Inc., Berman responded—

> [t]here were certain suppliers that had not changed over their bookkeeping or records to put everything into 3259 Richmond Avenue. On numerous occasions I had requested them to do that, a couple of them went along and finally did make the change, but I believe there were about two or three—no, maybe two that are outstanding, that still kept it as G & G (T., 8/25/88 at 98),

and that he contacted them in writing to effectuate the changes in ownership. *Id.*

When asked by opposing counsel if he had copies of those letters he responded "no" and that he never kept such letters. (T., 9/22/87 at 58).

It strains credulity to believe that Hallmark, one of this country's premier card suppliers, who had maintained a personal and professional relationship with G & G Cards & Gifts and its principals spanning a period of approximately nine years, would refuse to update their books to reflect the transfer in title after notification while still continuing to sell merchandise to Berman under the name of G & G Cards & Gifts, and this court therefore finds that no such notice was actually given.

What further troubles the court is Berman's veracity. His previous testimony about the alleged "non-sale" to Egers was completely refuted by DeBernardo. His "imagining" that the Russo sales proceeds were deposited into Season's Greetings' account does not pan out. And finally, his recount of the condition of the store as he left it on December 31, 1986 being contradicted by both Green and Maloy.

Berman offers the following as his recount of the store's condition when he closed it on December 31, 1986: there was inventory on the shelves, although slightly depleted; the fixtures remained intact; no fixtures or equipment had been removed prior to the closing (T., 9/22/87 at 65); and finally, no vulgarities or obscenities appeared on the walls. Further questioning however reveals that no weight can be afforded to his recount, for his self-contradicting and self-serving statements support a finding of his propensity to lie when it serves his interests. He testified that when he closed up shop he took with him approximately $100 worth of pens and dolls. (T., 8/25/88 at 115). When questioned by Mr. File at his 9/22/87 deposition, he testified that the gross value of inventory removed was "top $1,000.00." (T., 9/22/87 at 109). Berman attributes this differential to an "error" in judgment. (T., 8/25/88 at 115). Also, when questioned by Mr. File on whether at any time prior to closing he had removed any fixtures or equipment, he responded "no."

(T., 9/22/87 at 65). He did, however, later contradict himself. He testified that he threw out "racks and ... an overabundance of shelves ... a Christmas ornament—not a Christmas ornament, but a wrapping paper that was broken and falling apart that was of no value to me.... *I threw out anything and everything that I felt was of no value to the store any more."* (T., 9/22/87 at 67–68) (emphasis added). He further testified that while he threw out all these items, he never replaced any of them, and that whatever was thrown out had been originally purchased from the Greens and served as collateral for their promissory note. *id.*

When further questioned by his counsel about the value of all the goods discarded, he responded—"[i] guess I would have to say it was probably in the thousands. I couldn't put it in exact figures, because I don't know the exact number." (T., 9/22/87 at 110). There is no indication in the record that prior to discarding fixtures worth "in the thousands" that Berman contacted the Greens to gain their consent or otherwise notified them in any way of his intentions. Rather, he took it upon himself to throw out goods which *he* thought were valueless, although such assets served as collateral for the Greens' promissory note. Moreover, Berman's action seemingly violate the security agreement had between the parties.[3]

Finally, when questioned as to the specifics of what was and was not thrown out, he gave his usual—"I don't recall", "I don't remember", "I don't recollect" response or answers with like effect, as he had done throughout both his 9/22/87 deposition and 8/25/88 testimony. (*See*, T., 8/25/88 at 79, 80, 81, 82, 83, 86, 88, 89, 90, 91, 92, 93, 96, 97, 99, 103, 105, 106, 112, 115, 116, 118, 119, 121, 122, 123, 126, 127, 128, 129, 130); (T., 9/22/87 at 6, 13, 14, 31, 39, 43, 45, 46, 49, 52, 53, 54, 56, 60, 61, 62, 63, 64, 65, 66, 69, 70, 71, 72, 73, 74, 75, 76, 77, 79, 80, 81, 92, 95, 99, 102).

Berman has given this court no choice but to credit his testimony with little or no weight. Accordingly, we find the store's condition on December 31, 1986 to be that as described by both Green and Maloy. This is further buttressed by the fact that even if Berman's credibility was not in issue, his testimony still completely strains credulity. First, Berman would have this court believe that, but for the $100.00 of various knick-knacks taken by him prior to the closing, and the few sales had outside the ordinary course of business, all else remained the same. In fact, Berman responded "Yes" to the following question— "[a]re you saying that except for what was left at the time you vacated, everything other than the pens and the rag dolls that you just described was sold in the ordinary course of business?" (T., 9/22/87 at 64). This being so, if we credit the total amount of the goods taken by him prior to closing, and add that to the proceeds of sales held outside the ordinary course of business, the amount in question is *de minimus* when compared to Season's Greetings' amended selling price of $625,000.00 just 45 days prior to closing. This is especially important when one considers that the listing broker's fee was *commission based*, tied directly into the price obtained for the store. This leaves the court with the firm conviction that either Berman has either failed to account for the assets sold or the proceeds thereof. Otherwise, no conceivable justification for the $625,000.00 listing price could be had. Since the listing broker contracted for its fee on a commission ba-

---

**3.** The chattel agreement, Exhibit C in evidence, provides at paragraph 16 to the rider—

The debtor shall have the right to replace the collateral described in the schedule annexed, without the consent of the secured party, provided Debtor shall at such time comply with the provisions of any senior liens hereinbefore mentioned. Such replacements shall be of at least equal value and utility and shall have been fully paid for at the time of such replacement. Such replacement shall be subject to the provisions and lien of this agreement.

Regardless of whether what was discarded was inventory, furniture or equipment, Berman had a legal obligation to replace same pursuant to this contract. Berman testified that he did not replace any fixtures or equipment. (T., 9/22/87 at 68). Seemingly, this failure to replace those items discarded is in direct violation of their contractual arrangement.

sis, and even if we assume that a certain portion of the sales price is attributable to "puffing", as Berman would have us believe (T., 9/22/87 at 108), we must assume that the brokers hired are ably competent in their profession, and accordingly, find the asking price as indicative of a market value somewhere "in the range" of $625,-000.00. Berman has offered no proof to the contrary and we find none to exist. Second, as previously discussed, we find credible the testimony of both Brian (Green) and Maloy. Both testified, absent the presence of the other, that upon entering Season's Greetings on January 14, 1987 both doors were secured. Green testified that on January 14, 1987 he attempted to gain entry into the premises only to find both doors locked, and that upon peering inside he saw a dark desolate store lacking, based upon what he could see, of inventory and fixtures. He also testified that on January 2, 1987 all doors of entry were locked, and there was no difference in appearance of the store on both days. As Berman has failed to refute either Green or Maloy's testimony on this matter, we must find any assets missing attributable to Berman's action. This is further bolstered on two fronts—Maloy's uncontroverted testimony that in his belief no burglary or break-in had taken place and Berman's lack of credibility throughout his contradicted, confusing and self-serving testimony.

Berman's actions above, however, are only the "tip of the iceberg." Realizing that after the closing of Season's Greetings no business or other source of steady income would be forthcoming and that Elaine would be unable to maintain the monthly payments called for under Union's second mortgage, Berman set out on a concerted course to liquidate his individual assets, which ultimately were transferred to Union for the benefit of his wife. The reason for this is quite simple. By reducing the outstanding principal balance on the Union note, he assured his family continued shelter if, at a minimum, interest payments on the reduced Union mortgage could be maintained. During the period of time he remained unemployed, which spanned from January to July, 1987, he had to make

positive that there existed sufficient funds to cover interest payments on the Union mortgage, not to mention the additional $12,000.00 expense per annum for his daughter's college (T., 9/22/87 at 91) and the $305.00 monthly lease expense on what was then a new 1987 Nissan Maxima. (T., 9/22/87 at 95). To this end, Berman liquidated all joint accounts, all individual assets, particularly his IRA, and certain promissory notes, and drew down significant loans against the cash surrender value of his life insurance policies. All of these events took place pre-petition, within a three-month span from December, 1986 to March, 1987, just prior to filing his Chapter 7 petition. Although Berman remained liable on the drawdowns at the time he filed his Chapter 7 petition (T., 9/22/87 at 98–101), this liability was never scheduled on his originally filed petition, nor was that petition ever amended to reflect same.

From December, 1986 through the date his Chapter 7 petition was filed, the following series of calculated transactions and occurrences took place.

Berman maintained a savings account at East River Savings Bank (No. SV7–004519-0) in joint tenancy with Elaine. On November 14, 1986, Berman withdrew $6423.28 from this account, leaving it with a balance of $250.00. As of 12/31/86 this account had $298.16. On January 6, 1987, Berman withdrew this balance, closing out the account. Additionally, and without explanation, Berman closed out a joint checking account he had with his wife. There is testimony to the effect that this account had been in existence for quite some time. In fact, Berman testified that for a period of at least fifteen years, stemming back to when he first purchased the family's primary residence in 1973 that all mortgage payments were paid through this account. And, for a period of at least eight years, all rental checks on the primary residence were made payable to Berman, endorsed over to his wife, and deposited into this account as were all rental checks received on their jointly-held Florida property, which checks were made payable to Berman, endorsed over to his wife, and deposited in

the joint account. On or about January 1, 1987, this joint account was closed out and from that day forward all mortgage payments on the primary residence were processed and paid through the wife's individual account and all rental checks were deposited or otherwise transacted through that account.

Berman also liquidated certain promissory notes due him on the sale of his transmission business. Berman's statement of financial affairs indicates that from 1974–1984 he was the sole shareholder of Bermit Transmission Corp. and that sometime in 1984 he sold his business to "Ray Kovack & Simon" (T., 9/22/87 at 84), taking back certain promissory notes for the balance of the purchase price. As of December, 1986 the principal balance outstanding on these notes was $27,000. In December, 1986 Berman discounted these notes for $16,000.00 to Martin Brownstein, receiving a check from him for this amount. Sometime in February, 1987 this check was endorsed over to Trust "to repay a loan, to reduce a loan", although no default notice or demand letter was received from Trust, and, to the date of the paydown, all payments on the mortgage were current. (T., 9/22/87 at 90).

At about the same time he also cashed in his IRA account. (T., 9/22/87 at 88). In early 1985, when certain of his certificates of deposit became due, he rolled them over into a Dean Witter IRA. (T., 9/22/87 at 92). His statement of financial affairs reflects that sometime in March, 1987 he cashed in this IRA which at that time had an account balance of $32,445, and paid this amount over to Trust. This voluntary payment, like the above-mentioned $16,000 payment, was made at a time when no arrears were outstanding on the Trust mortgage, no default had been previously entered and no notices were sent reflecting any default. In sum, although current on second mortgage payments, Berman, in the months of February and March, 1987, made voluntary payments of approximately $48,000.00 to Trust.

Berman also drew down whatever amounts available against the cash surrender value of his life insurance policies. At his September 22, 1987 deposition he testified that "many months ago" (T., 9/22/87 at 99), "pre-petition", (T., 9/22/87 at 111), he drew down significant loans against the cash surrender value of his life insurance and that at the time he filed his petition he had no knowledge of the cash surrender value of these policies. Berman's schedules do not reflect his ownership interests in any insurance policies. Question r., on Schedule B–2, requires a description of the debtor's insurance policies. To this he responded "[n]one", although previously testifying that these policies still existed (T., 9/22/87 at 99), and that he was the sole owner (*id.* at 101). And of more significance, although he "believes" that he signed some documents regarding repayment on these loans (T., 9/22/87 at 100), Berman neither included this liability on his original schedule A–3, nor amended it to reflect same.

After careful consideration of the undisputed facts of this case, and taking into account the testimony of all of the witnesses, we find that the objector has sustained its burden of establishing the requisite actual intent to defraud under § 727(a)(2) by clear and convincing evidence, and accordingly, shall deny Berman his discharge under this sub-section. What we have here is the portrait of a desperate individual, one who has utilized all means to ensure continued safety and shelter for himself and his family while, through a meticulously planned and carefully concerted series of intra-family transfers, has fraudulently divested himself of essentially all his assets. The cumulative effect of these transfers has effectively led Berman to completely divest himself of what was essentially all of his individual assets and that of Season's Greetings, while still retaining the use and enjoyment of same.

First there was the sale to Bernard Block of Country Village. Then there was the sale to Russo. There was also the return of cigarette inventory to South Beach, while, at the same time, the simultaneous withdrawal of such funds from the corporate account as "accrued wages", just one business day after closing down Season's

Greetings. When questioned regarding the whereabouts of certain of Season's Greetings' bank statements which might help to shed some light on its business dealings, Berman responded that he had possession of them, and although previously notified of Green's request to produce these statements, failed to provide same. He also failed to request certain documents from Mr. Learner, Season's Greetings' accountant, although previously notified of Green's request. And, although asked to produce the general ledger, he left this "at home." (T., 9/22/87 at 40–44). In fact, almost all documents requested by Green's attorney were not brought by Berman, causing any further examination to be continued at a later date. (T., 9/22/87 at 107). To date, no documents requested have ever been produced.

There was also the DeBernardo sale. Although Berman testified that neither he nor his agent(s) ever sold any goods to DeBernardo, her testimony proved otherwise.

And recognizing that any and all joint accounts would be subject to attack he, with Elaine's assistance, closed out all these accounts while opening up accounts in Elaine's individual name. As of calendar year 1987 all of Berman's familial transactions were to be processed through this account. Berman offered no reasonable explanation as to why after some fifteen years this change was effectuated. Berman also offered no reasonable explanation why he liquidated certain individual assets, particularly the promissory notes and the IRA which he ultimately transferred to Trust.

While it is true that a series of transfers by a debtor may seem innocuous when viewed *in vacuo*, an inference of irregularity arises from a series of such transfers. *In re Vecchione*, 407 F.Supp. 609 at 616. This inference of impropriety is even more bolstered by the circumstances as they existed when the transactions took place. On the day he filed his Chapter 7 petition, Berman lacked legal title in all the assets transferred, while continuing to enjoy their use. He continued to use the primary residence although title was in his wife's name. And although the record title was in her name, this is not determinative of equitable ownership. *See, e.g., In re Beam,* 163 F.Supp. 333–35 (N.D.Ala.1958). For it was Berman who for the last fifteen years had made the mortgage payments on the house while Elaine remained a housewife with no income. It was only in January, 1987 that Elaine commenced making these payments while Berman remained unemployed. And even with Elaine's new found employment, the principal balance on the reduced mortgage was still too great, as evidenced by the fact that from January forward only interest payments would be made on the second mortgage. Yet, for some unexplained reason Berman failed to schedule this equitable interest on his schedules or amend them to reflect same. *See, e.g., In re Elliot,* 83 F.Supp. 771, 773–74 (E.D.Pa. 1948), *aff'd per curiam,* 173 F.2d 895 (3d Cir.1949) (debtor denied discharge based upon his concealment of an asset—an equitable interest in a house in which he lived and paid the mortgage); *cf., Molden v. Lucas (In re Molden),* 300 F.2d 5, 8 (7th Cir.1962) (where the court found that although the bankrupt had quit-claimed his interest in jointly-owned property to his wife, a secret trust cannot be found where it was his wife who not only made the total cash down payment on the house, but also paid the mortgage, taxes and all other expenses out of funds either inherited or earned by her). Unlike *Molden,* and similar to *Elliot,* it was Berman who paid the down payment on the house and continued to make the required mortgage payments on the primary residence. For this reason, Berman had an obligation to schedule his equitable interest, which he failed to fulfill. He had an even greater obligation to his creditors, that being not to fraudulently transfer essentially all of his individual assets to family members.

In *Vecchione, supra,* a father and son, both prior to filing for bankruptcy, but within one year of the filings, made certain intra-family transfers of individual assets to their wives, while still retaining a beneficial interest in those assets transferred. The trustee in bankruptcy objected to their

discharge under §§ 14(c)(1) and 14(c)(4) of the Act[4] on the grounds that such transfers were made with an actual intent to hinder, delay and defraud. The bankruptcy court found in favor of the bankrupt. On appeal, the district court reversed, finding that a *prima facie* § 14(c)(1) fraudulent concealment specification had been shown, leaving undecided whether the § 14(c)(4) specification was sustained.

In reversing, the district court stated—[w]hile each of the challenged asset transfers alone might be considered innocent, the totality of the situation is such that the court is impelled to conclude that both bankrupts have retained equitable interests in assets transferred to their wives. *In re Vecchione*, 407 F.2d 609 at 618.

Likewise, there is but one conclusion to be gleaned regarding Berman's consortium of transfers. The $48,000 transfers to Trust were made for and vicariously benefitted himself, his wife and children at the expense of his creditors. Without this payment, as Berman's testimony corroborates, there is but one question that Elaine's salary was insufficient to maintain the covering charges on the second mortgage, not to mention the monthly payments of $305.00 on the 1987 Nissan which, prior to December, 1986, were made through the corporate account, but as of January 1987, are now being made by Elaine through her individual account. Indeed, even with this significant principal paydown, Elaine's secretarial salary (T., 9/22/87 at 16) was barely sufficient to cover the interest payments now called for under the reduced balance. Berman's Current Income and Expenditures Schedule indicates a total monthly income of $475.00 comprised solely of the monthly rentals received on Elaine's primary residence. Other monthly income is comprised of Elaine Berman's "savings". As—(1) she was a housewife earning no income from 1973 to 1985, (2) did not receive any income from Season's Greetings (as all accrued wage checks were made payable to Berman personally), and (3) did not testify nor was there testimony of any other sources of income she may have, i.e., inheritances, either past or present, the only logical conclusion is that these "savings" were from one of two sources—monies saved during the course of her six-month employment as a secretary or voluntary transfers to her by Berman. We find the latter. This conclusion is further bolstered by the fact that her secretarial wages pale in comparison to the family's monthly current net living expenses of $2120.00, not to mention the $12,000.00 annual tuition for their daughter's college.

We must further find that the transfers in question were made with the requisite actual intent to defraud for they implicate not *one* badge of fraud but *all* of them. For example, Berman transferred all of his known property, less exemptions, pre-petition, for little, if any, consideration. These transfers vicariously benefit family members while allowing him to retain their continued use and enjoyment. Additionally, all of the transfers took place within three months prior to filing. And most importantly, these transfers effectively left him with no assets to satisfy his creditors. Manifestly, nothing evidences this actual fraudulent intent more than the timing of the familial transfers, for little or no consideration, while leaving his creditors with nothing but empty rights. And although "each suspicious transfer alone might give rise to two possible inferences, one of innocence and one of deceit", *Vecchione, supra*, we find that the cumulative effect of the transfers in question leaves but one permissible inference—that Berman "knowingly and fraudulently attempted to place ... his assets beyond the reach of ... his creditors and potential creditors while retaining the equitable enjoyment of those assets." *Id.* The chronology and

---

**4.** Section 14(c)(1) incorporates by reference the commission of "an offense punishable by imprisonment as provided under section 152 of Title 18...." Section 152 proscribes the knowing and fraudulent concealment of assets by the bankrupt from his estate. Section 14(c)(4) reaches transfers made with intent to hinder, delay or defraud creditors within twelve months of bankruptcy. Accordingly, any asset transfer prior to twelve months of bankruptcy must be shown to involve § 14(c)(1) concealment.

**658**

timing of the transactions in question coupled with the documentary, testimonial, extrinsic and circumstantial evidence presented to this court impel no other conclusion. The intent to defraud is obvious. *In re Kaiser, supra; In re Cadarette, supra; In re Vecchione, supra; National City Bank v. McNamara (In re McNamara),* 89 B.R. 648, 650–53 (Bankr.N.D.Ohio 1988); *The New World Marketing Corporation v. Garcia (In re Garcia),* 88 B.R. 695, 702–05 (Bankr.E.D.Pa.1988); *In re Tesmetges, supra; but see, Bank of Pennsylvania v. Adlman (In re Adlman),* 541 F.2d 999, 1001–03 (2d Cir.1976).

In *Adlman, supra,* the Second Circuit Court of Appeals reversed the district court's affirmance of the bankruptcy court's denial of the debtor's discharge. The *Adlman* court's conclusion was premised on the fact that a transfer prior to bankruptcy of non-exempt assets, *ipso facto,* does not compel the conclusion that there was an actual intent to "hinder, delay or defraud creditors." It was apparently troubled by the bankruptcy judge's failure to make specific findings of extrinsic facts to support its holding that there was an actual intent to defraud, *Adlman* at 1003, and the district court's affirmance thereof without specification of what "other evidence", in addition to that of the bankruptcy judge's, was considered. As a plethora of documentary, testimonial and circumstantial evidence to support a finding of *actual* intent to defraud has been adduced, we find *Adlman* distinguishable, and therefore do not rely upon it.

In sum, we find that the plaintiffs have set forth their *prima facie* case under § 727(a)(2) which Berman has failed to rebut, and deny the debtor his discharge on this ground. For this reason, we neither address nor dispose of plaintiffs' other claims for relief, as any adjudication thereon would be superfluous. An order to this effect shall be entered simultaneously with the filing of this decision.